WALLACE DODD, appellee, v. CLAIRE BLEZEK, appellant.

No. 48425.

(Reported in 66 N.W.2d 104)

SEPTEMBER 21, 1954.

Edward E. Eaton, of Sidney, for appellant.

Henry Read, of Shenandoah, for appellee.

WENNERSTRUM, J.—It is claimed by plaintiff that defendant has constructed a dike along a fence line separating their properties and that it has backed up water on his land thereby preventing the natural flow of water. The plaintiff demanded judgment claiming that he was damaged in that he was unable to put in crops on the affected land. He asked that the defendant

be restrained and enjoined from constructing any dam or artificial barrier which would obstruct the natural flow of water and that said defendant be required to remove any such present obstruction. The trial court found for the plaintiff and held that he was entitled to the injunctive relief sought. The defendant has appealed.

The plaintiff owns the West Half of the Southeast Quarter and the defendant the Southwest Quarter of Section 28 in Fremont County, Iowa. The plaintiff's land joins the defendant's land on the east.

These properties are on the east side of the valley of the West Nishnabotna River. In the northeast corner of Section 28 and running in a northwesterly direction there is a creek called Sheirbon Creek which flows into the West Nishnabotna River.

The trial court held the defendant's land is servient to the plaintiff's land for drainage purposes. The record submitted to this court comprises over 800 pages and in the briefs of the respective parties the evidence is extensively reviewed. A greater portion of defendant's brief is directed to an effort to show that the testimony of plaintiff and his witnesses is not substantiated by the facts as shown by other witnesses and that the topographical map prepared by plaintiff's engineer is inaccurate. There would be nothing gained by the bench and bar for us to set out in detail the testimony presented. It is admitted by counsel for both parties that the facts are determinative of this case. Both parties are in agreement concerning the applicable law. It is the application of the claimed facts to the law that has occasioned this appeal. Only to the extent that it may be necessary to substantiate our conclusions shall we refer to the testimony of the witnesses.

The topographical map prepared by the engineer for the plaintiff, as well as the map prepared by defendant's engineer, show there is not too great a fall in plaintiff's land from the east to the west. The map prepared by defendant's engineer is drawn to the scale of one inch to each 200 feet while that of the plaintiff's engineer is drawn to the scale of one inch to each 100 feet. Consequently it is somewhat difficult to compare the two maps. Inasmuch as the defendant's map is not marked in the

same detail as that of the plaintiff's map it is likewise difficult to compare the respective elevations found by the two engineers. The trial court found there were three natural swales or depressions by means of which water drained from plaintiff's land and onto defendant's land. These slight depressions are definitely shown on the map prepared by plaintiff's engineer. The south swale which is located in the southwest quarter of the southeast quarter (plaintiff's land) is about 200 feet north of the south fence line which is immediately south of the land of the plaintiff and defendant. There is a graded roadway which parallels the south lines of both the plaintiff's and defendant's land. The map of the plaintiff's engineer shows there is a drop in this swale from the center of the east portion of the southwest quarter of southeast quarter (plaintiff's south quarter) from an elevation of approximately 109 to an elevation of approximately 96.5 on the west side of the southwest corner of the land and adjacent to the defendant's land. Immediately across the division line and in the defendant's land the elevation is shown to be approximately a half foot lower than on the plaintiff's side of the division line. The swale appears to continue in defendant's land but with a very slight decline in the elevation. On the defendant's map the elevations in the southwest quarter of the southeast quarter are not given in much detail. It does appear, however, that the elevations to the east side of the southwest quarter of southeast quarter, judging from the markings to the north, are higher than those in the southwest corner of that quarter.

The court also found that there was another swale about 300 feet north of the south fence line which parallels the roadway previously mentioned. This second swale is definitely shown by plaintiff's topographical map but is not distinctly shown in the defendant's map. This swale appears to drain the north portion of the southwest quarter of the southeast quarter and the southeast portion of the northwest quarter of the southeast quarter. There is a further swale or depression which, according to the trial court, is about 1500 feet north of the south fence line of the plaintiff's and defendant's land. This north swale drains from the northeast corner of the northwest quarter of south-

east quarter to the southwest. The elevations on the maps of both the plaintiff and defendant show that it is higher to the northeast than it is to the southwest. It is in this last referred to swale and on the division line the defendant had constructed the obstruction or dike.

The trial court found that these swales were the only place by which the surface water from plaintiff's land and the land above it could possibly drain. It also found that the surface water coming down through these three natural swales drains onto defendant's land and then to a county road, to which reference has previously been made. It also found that the water after passing from defendant's land then passed under the county road and south to what has been referred to as Taylor's Lake. The court also found that there was a fall of approximately 3.70 feet between the level of ground directly east of the partition fence of the plaintiff and defendant at the north swale and the level of the swale where it leaves the defendant's land and flows into the ditch adjacent to the roadway previously referred to. This statement finds support in the topographical map of the plaintiff's engineer. However, the elevation decline, according to plaintiff's map, is at least one or two feet. Our conclusion is quite substantially borne out by the topographical map of the defendant's engineer although the showing regarding the elevations is not set out in the same minuteness as in the plaintiff's engineer's map.

The testimony presented on behalf of the defendant and his witnesses gives some support to the contentions of the plaintiff. The defendant, Claire Blezek, when called as witness for plaintiff, testified: "After I had the dike built there was water coming through that fence. It got over the ridge in the natural fence line and when it went against the dike it filled up the dike; it filled up the swale on the east side of the division fence. The water stayed there until it got too much water, then it went out both ends; both the north and south ends of my dike. Then it wouldn't go anywhere, just stayed there on the ground; spread out — as more water came in it just spread. * * * The water that drowned out all the 67 acres of ground, all but 4 or 5 or 6 acres, came from the north half of the division line between me and Mr. Dodd and from Mr. Dodd's

land. The rest that came in is water that came in the south half of my division line. * * * Water came and ran through those openings between the boards and sacks of dirt I put in there in that big rain in April, I would think. Thereafter I had this bulldozer plug up the gap and build up the dike. The water that came through in the big rain on or about May 20th also flooded this land."

And later the defendant testified: "At the time I had a dike constructed with the bulldozer along the division line fence on June 2nd there was water in that area at that time; on the east side of the fence there was water and there had been water flooding through on my side of the fence prior to that time. * * * I think I filled up this opening in the north 80 rods of the division fence twice prior to the time the dike was built. After I filled it, it either washed out or over it in fact; it cut some out. Water cut through that opening whenever it ran through instead of running over the ridge in the fence row, it ran back to the edge of that; the edge of the fill was soft and it got started on the end of it and she cut continually, but it cut through instead of over the fence line elevation. * * * That dike extends east and west and extends across this small swale; it has filled the whole swale, that dike."

Walter Blezek, testifying for the defendant, stated he farmed the Claire Blezek quarter from March 1, 1928, until January 1943. He further testified: "During the period I lived there I was familiar with the partition line between this quarter of Claire Blezek's and the Dodd eighty. * * * yes, there was some ridge under this fence. * * * I usually plowed around the field, you know. That would throw the dirt to the fence. * * *

"Since leaving there I have noticed an opening in that fence line and have seen breaks in that ground surface elevation. There is one I suppose probably fifty to sixty yards from the road on the south end; and then I don't know how far, I suppose around 200 yards on north from the road, there is another one; and there is one in the north eighty, I guess it is probably seventy or eighty-five yards north of the partition fence."

In connection with the testimony of Walter Blezek it should be noted he later testified on one occasion he had observed holes

in the fence line, and that there was dirt which had been blown out on the grass in the near-by field and the appearance of the ground was similar to occasions when he had blasted stumps. He also stated water that had been on the Dodd land had flowed through this hole and onto land which he farmed. He further testified when the Sheirbon Creek overflowed on a previous occasion it would not wash any holes or waterway in the fence row elevation between the Claire Blezek land and the Dodd eighty. It ran over the fence row elevation. He did testify in connection with the topography of Dodd land as follows: "The nature of the Dodd land from the northeast to southwest, it is a swale; it starts, I would say, up through here and runs to the southwest. It starts up nearly to the northeast corner. It runs to the southwest extremity; well, maybe not exactly to the corner—it may lack two or three rods." He also testified "I have testified that until 1937 this Claire Blezek quarter section received no water from the Dodd land except when Sheirbon Creek was in flood, with the exception there may have been a half acre in the extreme southeast corner that may have been wet from that side or the road ditch. After this opening appeared in the north eighty rods of the fence line * * * it let some of the surface water through there after that time."

Ed Blezek, the father of Claire Blezek, and another witness for the defendant testified as follows: "The character of the Wallace Dodd eighty as to whether it was a wet or dry tract when I first became acquainted with it, it was wet from the northeast to the southwest. The character of the soil in this part that he described as a swale, I think it is blacker soil than any of the rest, different soil; * * *." This witness for the defendant on cross-examination testified concerning the occasions when the Sheirbon Creek overflowed and stated in part as follows: "It went down to the south — some down through Wallace Dodd's eighty. * * * Where it went from the Henderson land, I wouldn't know any more than it went down through the Wallace Dodd eighty and the Claire Blezek 160, both. Yes, some of it went through the Claire Blezek land." The defendant, Claire Blezek, testifying in his own behalf, commented concerning the topography of the Dodd land as follows: "Yes, there is a prom-

inent·swale that goes across the Dodd land extending from the northeast corner of his tract .to the southwest corner. Yes, I know.what a swale is and that has been there ever since I knew it. This ridge or dike I suppose about is north of where his forty-acre division is. and is across the swale." He also. testified: "* * * I did have water get on me in 1944; it came in north of the forty line between .the two eighties — probably a couple of hundred feet north of the eighty rod line. That water came in there from the Wallace Dodd eighty and where it went on my place was practically anywhere it wanted to·go; it just spread out and stayed there for quite a while. Water also came in on me from the Dodd eighty on the south end."

We might set out additional testimony given by some of the witnesses which .bears out the fact that there is a general drop in the land from the northeast to the southwest in the plaintiff's land and this continues in a lesser degree as far as it relates to the defendant's land. It is true there has been some evidence presented by the defendant which indicates there had been some movement of dirt made by the plaintiff or some of his predecessor owners in the northwest corner of plaintiff's south quarter. It is claimed that this movement of earth accentuated the fall of the water passing over plaintiff's. and defendant's land. There is also testimony which was presented by the defendant that the plaintiff by one means or another opened up the dike or obstruction which had been placed on defendant's land. Despite all these facts a thorough reading of the record convinces us that the natural drainage is from the plaintiff's land onto and through the defendant's land. We are impressed by the testimony given by several witnesses that when there was an overflow of Sheirbon Creek the water flowed from the northeast over plaintiff's land onto and through defendant's land to the southwest. This further evidences the course of the natural drainage.

I. We have heretofore commented relative to the course of floodwaters on the affected lands. In this connection we have held the fact floodwaters move in a certain general direction is not determinative which of adjacent tracts is the dominant or servient one. Downey v. Phelps, 201 Iowa 826, 832, 208 N. W. 499. The disposition of ordinary surface water is determined

1120

by the relative elevations of adjacent tracts. Downey v. Phelps, supra. In Hunt v. Smith, 238 Iowa 543, 555, 28 N. W. 2d 213, in commenting on whether floodwaters should be regarded as surface waters we said the decisions are not in harmony. It would seem, however, the course of floodwaters, along with the general course of surface water, may and should be considered in determining the general elevations of land as it affects drainage.

■ II. Throughout the record reference is made by several witnesses regarding certain swales in plaintiff's land. In the Hunt case, supra, page 557 of 238 Iowa, page 220 of 28 N.W. 2d, we held a swale is a natural watercourse.

And in the Hunt case, supra, reference also is made to the case of Wharton v. Stevens, 84 Iowa 107, 112, 113, 50 N. W. 562, 563, 15 L. R. A. 630, 35 Am. St. Rep. 296, where it is stated: "But where surface water has a fixed and certain course, as a swale, though it may be narrow or broad, its flow cannot be interrupted to the injury of an adjoining proprietor."

In the present case the testimony of various witnesses shows there is a general flow of surface water through the swales from plaintiff's land to and over defendant's land. Parizek v. Hinek, 144 Iowa 563, 565, 123 N. W. 180.

■ III. The defendant as grounds for reversal claims the findings of fact of the trial court are at variance with the record. We cannot so hold. It is further claimed the plaintiff has altered the topography of his land and has thus artificially forced water over the land of defendant. There may have been some change of the land in the northeast corner of plaintiff's south quarter yet it is not shown that the swales lower in this land were in any way thereby affected. The general drainage was the same. And in the Parizek v. Hinek case, supra, we held the owner of dominant land has the right to drain his land into a natural watercourse, despite the fact the quantity of water cast upon the servient estate is somewhat increased. Section 465.22, 1950 (1954) Code is the applicable statute to the facts in this case. It is therein stated, in part: "Owners of land may drain the same in the general course of natural drainage by constructing open or covered drains, discharging the same in any natural water-

course or depression whereby the water will be carried into some other natural watercourse, and when such drainage is wholly upon the owner's land he shall not be liable in damages therefor."

It has been our holding an upper landowner may construct a drain to make possible the carrying of water from his land in its natural and usual course onto and over the land of another unless it can be shown there is an increase of water which materially results in damage to the lower landowner. There has been no such showing in this case. A dominant estate has the right to discharge water upon a servient estate whether such water is surface water or from a natural watercourse. Cundiff v. Kopseiker, 245 Iowa 179, 184, 185, 61 N. W.2d 443.

█ It does not appear an appreciable amount of water was cast into the natural drainage by the slight change in the drainage in the northeast corner of the plaintiff's south quarter. It is also asserted as grounds for reversal that the trial court gave undue acceptance to the topographical map prepared by plaintiff's engineer and failed to give a fair assessment of all the evidence presented. We have endeavored to make use of all phases of the evidence. After having done so we have concluded there is ample basis for the decree entered by the trial court enjoining the defendant from obstructing the natural flow of water from plaintiff's land.—Affirmed.

All JUSTICES concur.