**Larry MOODY and Karen Moody, Appellants,**

v.

**Glenn VAN WECHEL, Judith Van Wechel, and Van Wechel Farms, Inc., Appellees,**

**Byron C. Skiles, James P. Skiles, and Hazel Primus, Intervenors,**

**David Primus, Appellee.**

No. 85–657.

Supreme Court of Iowa.

March 18, 1987.

Robert R. Rush and Randall B. Willman of Lynch, Dallas, Smith & Harman, Cedar Rapids, for appellants.

Mark Mossman of Mossman & Mossman, Vinton, for appellees.

Jared O. Bauch of Bauch Law Offices, Traer, for intervenors Skiles.

Robert C. Tilden and Roger W. Stone of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellee David Primus.

Considered by HARRIS, P.J., and McGIVERIN, WOLLE, LAVORATO, and NEUMAN, JJ.

HARRIS, Justice.

This suit presents a classic example of a surface water dispute in rural Iowa. Farm practices and the passage of time have intruded upon the natural flow of surface water from dominant to servient estates. Adjoining landowners have reacted by altering the lay of the land. The trial court

devised a plan to resolve the dispute which seems to have dissatisfied all parties. Each has appealed. A decision which draws such unanimous condemnation by all litigants is apt to be a wise one. We think the one challenged here is, except for one detail, best under the circumstances. We modify and affirm.

The Van Wechels and Moodys own adjoining farms in Benton County. The Van Wechel farm is to the west; the Moody farm is to the east. A woven wire partition fence, running north and south, is maintained along their partition line. By agreement the Van Wechels are responsible for maintaining the southern half of the partition fence and the Moodys are charged with maintaining the northern half. The Skiles own a tract to the north which adjoins the Van Wechel and Moody tracts. Farther east the Moody farm is adjoined by one owned by the Primuses. The following sketch shows the relative positions of the tracts.

Because we cannot improve on the trial court's description of the water flow in the area, we quote from its findings and adopt them into the factual statement of the case:

[F]rom the late [19]40's to early [19]50's the surface water had a natural flow on the Van Wechel parcel from the south to the north along the fence which [divides] the Van Wechel parcel from the Moody parcel, and a natural surface water flow from the west generally to the east.... [T]he Van Wechel parcel has two primary west to east waterways and one or two minor west to east waterways.... [A]t about midpoint on the south/north partition fence, the west to east surface

water would join the flow of water from the south to the north, and the water would proceed in a northerly direction and disperse some onto the Moody parcel and some onto the Skiles parcel. During an extra heavy rainfall or flow of water, the water would disperse sooner onto the Moody land by seeping through the partition fence.

... [O]ver the course of many years and because of the farming practices of all the parties to this lawsuit, but primarily because of the farming practices of Van Wechel and Moody, the north half of the south/north partition fence became "built up" or "elevated" on each side of the fenceline, including the area of the fenceline itself due to crop residue and silt deposits being washed into and plowed into the fenceline.

... [A]s a direct result of the "build-up" along the partition fenceline, less surface water escaped naturally from the Van Wechel parcel to the Moody parcel, resulting in water ponding on different occasions in the northeast corner of the Van Wechel property. The parties seemed to tolerate this situation in the years of normal to below normal rainfall; however, in 1982, the general area received a record rainfall which caused an unacceptable amount of water to remain or to pond on the Van Wechel property.

... [T]he northwest ten to twenty acres of the Moody parcel historically and naturally retained water or had water pond on it when there has been above normal rainfall, or when there is commonly what is known as a cloudburst. The situation in 1982 prompted Van Wechel to contact the soil conservation service requesting information or suggestions to alleviate the surface water problem.... [A]ll the parties were involved in various degrees with attempting to find ways to alleviate the general problem which affected all parcels, but were unable to agree on a mutually acceptable plan....

... [I]n May of 1983, Van Wechel unilaterally and without the consent, acquiescence or waiver of any rights by the other parties to this lawsuit, constructed a "berm" just south of the midway point in the south/north partition fenceline.... [B]y constructing the "berm," Van Wechel intended to collect the water flowing from the south to the north in its natural waterway and the water from one or two of the west/east waterways and divert the same through the partition fence onto the Moody parcel. In addition, Van Wechel constructed a 1,350 foot "cut" along the west side of the south/north partition fenceline from a point just north of the "berm" to the east/west partition fenceline, which resulted in surface water being "troughed" to the east/west fenceline, eventually dispersing onto the Moody, Skiles and Primus parcels.

... [A]s a direct result of the two construction projects, the existing natural waterways were, in effect, destroyed or so altered that substantially more water was being dispersed onto the Moody, Skiles and Primus parcels than was dispersed on [them] prior to the construction projects.

... [A]fter Van Wechel constructed the "berm," the Moody parcel received a substantially greater volume of water at a considerably greater force, which caused damage to Moody's crop ground and crops.... [A]fter Van Wechel constructed the "trough" or "cut" which carried the surface water more directly to the north, a substantially greater volume of water with greater force was dispersed onto the Skiles, Primus and Moody parcels.... [A]s a direct result of the greater amount of water at a greater velocity being dispersed onto the Moody parcel as a result of the "berm," the Moody parcel suffered soil erosion and a reduced corn yield in the years of 1983 and 1984.

... [W]hen the surface water disperses from the Van Wechel parcel through the east/west partition fence onto the Skiles parcel, the natural flow of water then begins to flow in an easterly direction and along the fenceline and dis-

perses onto the Primus parcel and back onto the Moody parcel.

There is a substantial fall across the Van Wechel property from west to east, with less fall from south to north. The Van Wechel farm is higher than both the Moody and the Primus/Skiles tract. From six to seven acres of the Van Wechel property drains naturally onto the Skiles farm.

In the late nineteenth century a dam was built along Pratt Creek, which flows through the Skiles and Primus properties, to create a pond of water to power a mill. The mill was built approximately one mile southeast of the dam and a mill race was built, crossing from the Skiles property southeast across the Moody parcel. After the mill burned down in 1896 the mill race continued to serve as a surface water drain over the Moody property. Tile lines emptied into it and various prior owners of the Moody parcel cleaned it regularly in order to facilitate drainage. In 1984, after initiating this lawsuit, Moody filled in the mill race.

The additional water entering the Skiles land by way of the channel or trough was intended to follow the path of the old mill race, continuing southeast across the Skiles and Moody partition fence line. Since 1984, however, this water has been unable to continue southeast onto the Moody land because of the debris in the fence line between the Van Wechel and Moody properties. Eventually, the standing water along the partition fence has ponded, drifting east onto the Primus parcel.

In the fall of 1983 David Primus used a bulldozer to clear a thirty to forty foot wide area of the old mill stream on the Skiles property. On the Hazel Primus parcel David lowered the elevation of approximately thirty to forty feet of land along the east/west fence line. The Moodys claim that David Primus entered their property without permission to make these altera-tions, and that they were completed for the sole purpose of diverting additional surface water southeast onto their property.

The Moodys brought this action for damages and also sought equitable relief. They asked for an order directing the Van Wechels "to restore the land to its natural state as it existed prior to their willful acts." The Van Wechels answered and counterclaimed, asking that the Moodys be ordered "to restore the land to its natural state of surface water drainage." The Skiles and Primuses intervened and also asked for an order restoring the land to its original condition.

Following trial as an equity case, the court made the findings we have adopted and assessed damages in favor of the Moodys and against the Van Wechels in the sum of $375 for "grading [and] earth moving work to recondition [Moodys'] field." No crop damages were allowed, however, because the court found insufficient evidence to fix them.

The Van Wechels were enjoined from maintaining the berm and trough. The partition fences were ordered removed and the ground around them leveled to "permit the surface water to flow naturally and seep onto the Skiles, Primus, and Moody parcels from the Van Wechel parcel."

The court directed the parties to agree to a plan (at equal expense) for a farmed-through waterway. If the parties could not consent to an acceptable drainage plan, the court's order retained jurisdiction for appointment of a special master to devise such a plan.

■ The parties were unable to agree on a plan and the court selected first one and later another. The first plan called for an extensive farmed-through waterway to be paid for equally by the three parties. Upon further hearing[1] the trial court ordered implementation of a much more modest plan. In addition to removal of the

1. The Moodys contend the trial court lacked jurisdiction to expand on its original order because, by the time it was entered, they had already appealed. Permission to appeal that order was granted under Iowa R.App.P. 2. The trial court had authority to retain jurisdiction to complete determination of the dispute. The other parties appeal from the final order, giving us jurisdiction over all appeals in the case.

berm and trough, and the debris from the fence rows, it ordered a plan suggested by the Moodys. At an estimated cost of $4500.75, the Moodys recommended the construction of a twelve foot wide, four foot deep west-to-east ditch, running along the Skiles/Moody fence line. The ditch would extend from the northwest corner of the Moody parcel to the northeastern border of the Moody land, flowing west to east and eventually reaching Pratt Creek.

I. Our review is de novo. *See First National Bank in Lenox v. Brown,* 181 N.W.2d 178, 181 (Iowa 1970) (cases commenced as law actions but tried in equity by consent of the parties are reviewed de novo).

■ The trial court correctly interpreted the law concerning surface water drainage. In determining which of adjacent tracts is dominant, relative elevation and not general movement of floodwaters is controlling. Water from a dominant estate must be allowed to flow in its natural course onto a servient estate. The flow may not be diverted by obstructions erected or caused by either estate holder. These corresponding rights and obligations do not mean that low parts on land must retain water in ponds until it percolates into the soil. A landowner may divert water by surface drainage constructed upon his or her own land even though some different or additional water may thereby enter the servient estate.

■ This right to employ modern drainage practices, sometimes called lip surface drainage, is not without limits. Plainly, the holder of the dominant estate clearly may not go so far as to collect and discharge water upon the servient estate in such a manner as to cut a stream bed. The servient estate is obligated to receive water from higher land, but not in such a way as to cut channels which did not previously exist. The foregoing principles have been spelled out in many cases. *See, e.g., Ditch v. Hess,* 212 N.W.2d 442, 448 (Iowa 1973); *DeWitt v. DeWitt,* 259 Iowa 1037, 1039, 147 N.W.2d 32, 33 (1966); *Dodd v. Blezek,* 245 Iowa 1112, 1119–21, 66 N.W.2d 104, 108–09

(1954); *Stouder v. Dashner,* 242 Iowa 1340, 1348–49, 49 N.W.2d 859, 863–65 (1951).

■ We think the principles were properly applied to the facts here. A fence row should be maintained so as to allow free passage of surface water. When fences, as they sometimes do, become filled with debris or soil, whether carried by water or directly built up by tillage of the soil, or when the obstruction results from growth of trees or brush, they should be cleared. When the parties themselves cannot agree on a plan to clear the obstructions, an equity court should, as it did here, devise one.

■ We also agree with the trial court's selection of a plan to carry water from the area. The plan does call for conveying water by a route somewhat at variance with the natural flow across Moodys' land. But the variance can be justified because it was requested by the Moodys. It is a workable, practical plan, and less expensive than the one first selected. We approve it with one exception.

The trial court assessed the costs against the Moodys alone. We think the costs should be shared equally by the parties.

II. The trial court allowed the Moodys only $375 in actual damages. It found insufficient evidence to fix the amount of crop damages sustained by the parties, finding "no evidence in the record of the value or cost of cultivating, harvesting, or marketing any growing crop had it not been destroyed."

■ The proper measure of damage for the loss of growing crops, as the trial court correctly recognized, is "their value in the field at the time of injury or their value in matured condition less the reasonable expense of maturing and marketing." *Eppling v. Seuntjens,* 254 Iowa 396, 402, 117 N.W.2d 820, 824 (1962). *See also Oak Leaf Country Club, Inc. v. Wilson,* 257 N.W.2d 739, 748 (Iowa 1977); *Blunck v. Chicago & Northwestern Railway Co.,* 142 Iowa 146, 155–58, 120 N.W. 737, 739 (1909).

We agree with the trial court that there is insufficient evidence to fix damages. There is no showing of the value of the crops which were ruined. In Moodys' speculative estimates of the overall damages, no allowance was made for damages the crops would ordinarily receive from surface drainage. *See Eppling*, 254 Iowa at 402, 117 N.W.2d at 824 (this court refuses to engage in "speculation" in order to calculate crop damage).

III. We have not overlooked two other assignments. There is no merit in Moodys' challenge to the trial court's refusal to allow punitive damages. There is no showing of malice on the part of the Van Wechels, a requisite for a punitive damage award. *Braverman v. Eicher*, 238 N.W.2d 331, 339 (Iowa 1976). And there was no abuse of discretion in the trial court's appointment of the Benton County soil conservation service district as a special master to superintend the project it ordered. The selection is challenged because representatives of that office had testified for the Van Wechels at trial. We do not interfere with the exercise of discretion in the absence of a showing that it "was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable...." *Glenn v. Farmland Foods, Inc.*, 344 N.W.2d 240, 243 (Iowa 1984) (quoting *State v. Morrison*, 323 N.W.2d 254, 256 (Iowa 1982)). Under that standard we have no cause to interfere here.

The determination of the trial court is modified so as to call for assessing construction costs one-third against the Moodys, one-third against the Van Wechels, one-sixth against the Skiles, and one-sixth against the Primuses. Costs on appeal are taxed in the same proportions. As modified the judgment of the trial court is affirmed.

AFFIRMED AS MODIFIED.