# IN THE COURT OF APPEALS OF IOWA

No. 23-2061
Filed October 30, 2024

**MICHAEL MCKEE and DIANE MCKEE,**
    Plaintiffs-Appellants,

**vs.**

**CITY OF COUNCIL BLUFFS,**
    Defendant-Appellee.

_____

Appeal from the Iowa District Court for Pottawattamie County, Michael Hooper, Judge.

Property owners appeal a district court decision denying them relief in a dispute over surface water drainage. **AFFIRMED.**

Dane J. Schumann of Capitol Counsel, PLLC, Urbandale, for appellant.

Malina M. Dobson, Assistant City Attorney, Council Bluffs, for appellee.

Heard by Schumacher, P.J., Badding, J., and Chicchelly, J.

**BADDING, Judge.**

This is Michael and Diane McKee's second appeal in a dispute over surface water drainage from Simms Avenue—a road owned by the City of Council Bluffs that abuts the McKees' lower-lying land. In their first appeal, we reversed the district court's grant of summary judgment for the City on the McKees' claims for declaratory or mandamus relief, private nuisance, and pure nuisance and remanded for further proceedings. *McKee v. City of Council Bluffs*, No. 21-1117, 2022 WL 2160681, at *2 (Iowa Ct. App. June 15, 2022). After a bench trial on remand, the court found the McKees' "property, for drainage purposes, has always been the servient estate to the higher-lying land surrounding it," including Simms Avenue. But the court determined the City was not responsible for the damage the McKees claim their property has suffered from the surface water drainage and dismissed their claims against the City. We affirm that ruling.

I. **Background Facts and Proceedings**

Some of the basic facts giving rise to this drainage dispute were laid out in our opinion reversing the district court's grant of summary judgment for the City:

> In 1987, the McKees purchased real property situated north of and abutting Simms Avenue. Simms Avenue is now owned by the City. According to the amended petition, the McKees' home is located "down a lane a few hundred yards away from Simms Avenue" and, when they purchased the property, "a small amount of drainage from Simms Avenue ran into a small ditch parallel with the McKees' lane that accessed their home" and this "drainage channel continued North, passing under the McKee's driveway and then meandering downstream until crossing the McKees' Northern property line."

*Id.* at *1.

At trial, Michael described this historic drainage path—which he said has been the same "since the beginning of time"—as a small swale that ran "north along the east side of the driveway until it encountered an 18-inch tube across the driveway, east to west, and allowed the water to another swale to reach its final course it wanted to go, to the north." Michael testified the swale was only about a foot deep and "not even three feet" wide. Between 1987 and 1992, Michael said the swale handled every rainfall and did not erode. That changed, according to both McKees, in 1992 when they sold the south two acres of their fourteen-acre property to a land developer. As we set out in our opinion from the first appeal, which testimony and evidence at the trial confirmed,

> Beginning in early 1992, the McKees entered into a purchase agreement and various addendums to sell a southern strip of their property abutting the north side of Simms Avenue to Duggan Land Development, Inc. (Duggan)—which Duggan would develop as a single-family subdivision called Northern Oaks—with the McKees retaining a right of way to Simms Avenue for their driveway. The portion of land attributable to the McKees' pre-existing driveway would ultimately come to be known as Lot 7. In March, Duggan and the City entered into a subdivision agreement concerning the final plat consisting of the twelve-lot subdivision. The agreement required Duggan to complete certain steps before the City would issue final plat approval.
>
> On April 16, the McKees deeded the strip of land to Duggan. The same day, Lot 7, "as shown in a survey drawing by Paul M. Kline dated April 7, 1992," was deeded back to the McKees by Duggan. The following is a portion of the Kline survey that was referenced in the deed:



As the image demonstrates, the striped portion of Lot 7, just east of the "existing drive," is a "PRIVATE 10' STORM DRAINAGE EASEMENT," and the survey provides: "THIS DRAINAGE EASEMENT AND DRAINAGE SYSTEM IS TO BE INSTALLED AND MAINTAINED BY THE OWNER AND HIS OR HER ASSIGNS OF LOT 7 OF NORTHERN OAKS SUBDIVISION."

*Id.*

Once construction on the subdivision began, which included the installation of a 24-inch corrugated metal pipe under Simms Avenue that discharged onto Lot 7, the McKees started experiencing drainage problems. Michael testified: "It increased dramatically. The flows were tremendous, the velocity was terrible." Because of these problems, the McKees sought relief from the City in October 1992 and again in March 1993. But the City denied responsibility because of the

McKees' agreement with Duggan for the private 10-foot storm drainage easement on Lot 7.

After their efforts with the City went nowhere, the McKees hired a contractor in 1994 or 1997 to install a drainage system on Lot 7 for the first time. Michael explained that the contractor "[d]ressed up the site around the outlet of the 24-inch [pipe] and just tried to reestablish the cross section of the ditch there at the time" down to the preexisting 18-inch pipe running under their driveway. That was the only drainage system in place on Lot 7 until 2001 when the owner of Lot 8 threatened legal action against the McKees. A letter from that owner's attorney alleged that sinkholes had formed on Lot 8 because of the "inadequate" system on Lot 7 that had "fallen into a state of disrepair." To address the issue, Michael testified that he "purchased 180 feet [of] 24-inch corrugated metal pipe." He then hired another contractor to attach the pipe to the outlet at Simms Avenue. The contractor also replaced the 18-inch pipe underneath the McKees' driveway with a 36-inch pipe and changed its drainage direction because the McKees' front yard was flooding. The McKees took these steps without consulting an engineer or the City.

While these steps resolved the issues on Lot 8, and the flooding in the McKees' front yard, the northwest corner of the McKees' property started eroding. Aerial photographs show a widening cavern over the years that, as exhibits admitted at trial illustrate, has progressed from this in 2006:

6



to this years later:



The Northern Oaks Subdivision can be partially seen at the bottom of the last photograph, with the McKees' driveway extending north from Simms Avenue through Lot 7 to their house. The dark line branching off to the west and north from the driveway is a ravine from erosion that Michael said is as much as fifty-feet deep and forty-feet wide.

The McKees sued the City in August 2020, alleging "they never 'agree[d] to maintain any easement on Lot 7' and, due to the subdivision improvements and infrastructure, they experience flooding and erosion from drainage." *Id.* at *2. They also alleged "the City was the dominant estate holder of any easement on Lot 7 and the continued flowage path of drainage across the remainder of their property." *Id.* Count one of their petition "sought relief requiring the City, as the dominant estate holder, to repair and maintain the easement on the Lot 7 portion of their property," while count two "sought the same relief, but as to the drainage path that continues on the portion of their property north of Lot 7." *Id.* "The McKees also alleged the drainage on their property amounts to a private and pure nuisance and the invasion of their property is an unconstitutional taking." *Id.*

On the City's motion for summary judgment, the district court found the McKees accepted an express easement on Lot 7 in their dealings with Duggan, which placed the burden of maintaining the easement on the McKees rather than the dominant estate. As for the McKees' argument about the water flowing from Simms Avenue through Lot 7 to the north of their property, the court found

> that Lot 7 is dominant to the northern property, and therefore, it is subject to the general rule regarding the flow of water: Lot 7 has a right to the natural flow downward and is responsible to the northern property for the associated maintenance costs. Since the McKees

> own both properties, they are still responsible for the water flow from Lot 7 to the northern property.

(Internal citation omitted). These findings led the court to conclude that the City was entitled to judgment on counts one and two of the petition. The court then dismissed the remaining counts as time-barred.

In reversing the district court's entry of summary judgment on count two,[1] we agreed with the McKees "that when Lot 7 was deeded back to the McKees and they became owners of both properties, they merged and any easement between Lot 7 and the northern property was extinguished." *Id.* at *3. Our opinion continued:

> True, the McKees are responsible for maintaining the express easement on Lot 7. But Simms Avenue is dominant to both Lot 7 and the north portion of the property. According to the district court, the McKees are only responsible for Lot 7 because the documents creating the express easement on that lot overruled the general rule that the easement holder is responsible for repairing and maintaining the easement. What lies beyond Lot 7 on the northern portion of the McKees' property and who is responsible for it remains a genuine issue of material fact subject to legal underpinnings the district court did not address.

*Id.* (footnote omitted) (internal citation omitted). As for the McKees' nuisance claims in counts three and four, we found the district court erred in finding those claims were barred by the statute of limitations. *Id.* at *4.

On remand, the parties agreed to waive their previously requested jury trial and proceeded to a bench trial in August 2023. Both sides presented expert testimony from civil engineers about the drainage issues on the McKees' property,

---

[1] The McKees did not appeal the dismissal of counts one or five. *Id.*

as well as the McKees' own observations from the decades they had lived there. After reviewing this evidence, the district court dismissed the McKees' claims.

In its ruling, the court repeated our statement in the first appeal that "Simms Avenue is dominant to both Lot 7 and the north portion of the McKee property." But it found the experts disagreed on the cause of the drainage problems and whether the flow of water across the McKees' property substantially increased after construction of the subdivision. The court discussed that testimony and found the McKees had failed to prove "that there has been a substantial increase in drainage." Instead, the court determined the McKees' property had been damaged "because of the velocity of the water exiting the drainage system they installed" on Lot 7. The court accordingly concluded "that the McKees are responsible for the northern portion of their property and no easement of any kind exists beyond the natural drainage path."

The McKees appeal, asserting that the district court erred in (1) "fail[ing] to identify [the City] as the dominant estate for the easement at issue" under count two and require it to "repair, maintain, and clean" that easement; (2) dismissing their claim for private nuisance because of the City's failure to install drainage infrastructure on the property north of Lot 7; and (3) declining to find the "stormwater volume increase is a pure nuisance."

II.     **Standard of Review**

Before wading into the merits of the McKees' claims on appeal, we must determine our standard of review. The McKees argue the case was tried in equity, so we should conduct a de novo review, while the City contends the "action should be considered legal in nature."

"Our review of a decision by the district court following a bench trial depends upon the manner in which the case was tried to the court." *Dix v. Casey's Gen. Stores, Inc.*, 961 N.W.2d 671, 680 (Iowa 2021) (cleaned up). To determine whether a proceeding is legal or equitable, "we look to the pleadings, relief sought, and nature of the case." *Id.* (citation omitted). "With competing indicators on both sides, we elect to review these claims de novo because we would reach the same result if we were reviewing for correction of errors at law." *Hindman v. Hindman*, 988 N.W.2d 420, 425 (Iowa Ct. App. 2022); *accord Albert v. Conger*, 886 N.W.2d 877, 880 (Iowa Ct. App. 2016). Yet, even on de novo review, we do not "decide the case in a vacuum, or approach it as though the trial court had never been involved." *Hindman*, 988 N.W.2d at 425 (citation omitted). Instead, we give "'great weight' . . . to the findings of the district court where the testimony is conflicting since the trial judge 'is in the best position to assess the witnesses' interest in the trial, their motive, candor, bias, and prejudice.'" *Id.* (citation omitted); *accord Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024).

## III.     Analysis

### A.      Count Two—Drainage on the Property to the North of Lot 7

In count two of their amended petition, which was captioned, "Declaratory and mandamus action for City to clean and maintain the easement that carries stormwater north through the rest of the McKee property," the McKees alleged the City was the "dominant estate holder for whatever easement under which this stormwater passes through the McKees' property." As the dominant estate holder, the McKees contended the City "has the obligation to repair and maintain their easement," which the City failed to do. For relief, the McKees sought issuance of

a mandamus order "to compel the City's performance of whatever duty may be established within this action."[2]

"Mandamus is generally limited to occasions where an official or entity has a duty to act." *Hicks v. Franklin Cnty. Auditor*, 514 N.W.2d 431, 441 (Iowa 1994). The McKees rely on general easement principles as the source of the City's duty to "repair, maintain, and clean" its drainage easement across the northern part of the McKees' property. Turning to those general principles, it is well-settled

> that the owner of the upper or dominant estate has a legal and natural easement in the lower or servient estate for the drainage of surface waters, that the natural flow or passage of the waters cannot be interrupted or prevented by the servient owner to the detriment or injury of the dominant proprietor . . . and that the owner of the dominant estate may cast an additional quantity of surface water upon the servient estate; if in so doing, he does not thereby do substantial damage to the servient estate.

*Ditch v. Hess*, 212 N.W.2d 442, 448 (Iowa 1973) (citation omitted); *accord Moody v. Van Wechel*, 402 N.W.2d 752, 757 (Iowa 1987) ("Water from a dominant estate must be allowed to flow in its natural course onto a servient estate. . . . A landowner may divert water by surface drainage constructed upon his or her own land even though some different or additional water may thereby enter the servient estate.").

Because the natural flow of water from the higher-lying Simms Avenue runs down to and through the McKees' lower-lying property, the City is—as we stated

---

[2] On appeal, the McKees also request an injunction under this count. While they made the same request in their trial briefs, they did not ask for injunctive relief in their petition, and the district court did not address the request in its ruling entering judgment for the City. So we find it is unpreserved for our review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

in the first appeal and the district court restated on remand—the dominant estate. *McKee*, 2022 WL 2160681, at *3; *see Ditch*, 212 N.W.2d at 448; *see also Moody*, 402 N.W.2d at 757 ("In determining which of adjacent tracts is dominant, relative elevation and not general movement of floodwaters is controlling."). The City does not dispute this. So we reject the McKees' insistence that the district court "fail[e]d to identify the dominant estate" for the property to the north of Lot 7.

From there, the McKees argue the City "has all maintenance, repair, cleaning, and other duties associated with being an easement's dominant estate." *See Koenigs v. Mitchell Cnty. Bd. of Supervisors*, 659 N.W.2d 589, 594 (Iowa 2003) (stating that absent an agreement to the contrary, "easement holders not only have the right but an obligation to repair and maintain their easement as necessary" (citation omitted)). We disagree. *See, e.g.*, *Grace Hodgson Tr. v. McClannahan*, 569 N.W.2d 397, 400 (Iowa Ct. App. 1997) (finding resolution of drainage dispute did not depend on just elevation but on "water flow, the alteration of the land's natural features, and the drainage district ditch and the county road ditches").

We first observe that the McKees' claim in count two is not based on the City's failure to repair or maintain the drainage system the City installed at Simms Avenue to control the flow of water onto the McKees' property, as their argument might suggest. *Cf. A.D., L.L.C. v. 2004 SC Partners, L.L.C.*, No. 13-1498, 2014 WL 6680884, at *7–8 (Iowa Ct. App. Nov. 26, 2014) (discussing a dominant estate owner's duty to maintain a drainage system on the dominant estate); *Newlin v. Callender*, No. 10-1014, 2011 WL 5460279, at *4–6 (Nov. 9, 2011) (addressing a servient estate owner's claim against the dominant estate for failing to maintain a

drain pipe on the dominant estate).  Instead, the McKees claim the City, as the dominant estate, "must install drainage infrastructure" on the McKees' property because "its increased water volume onto the servient [estate] is causing damage." The McKees cite no authority for the proposition that the owner of a dominant estate can be mandated to install infrastructure *on the servient estate*, particularly where there is an express easement agreement requiring the servient estate owner to install and maintain a drainage system on the portion of their land abutting the dominant estate.  And our cases on surface water drainage provide "that when water is moved from the dominant land to the servient land by nature, or by a tile line in the natural course of drainage, the water becomes the water of the servient owner."  *McKeon v. Brammer*, 29 N.W.2d 518, 521 (Iowa 1947); *accord Johannsen v. Otto*, 282 N.W. 334, 336 (Iowa 1938).

In any event, the McKees' argument overlooks the effect of the general principles from *Ditch* and other cases, which is "that the dominant owner is entitled to drain surface water in a natural watercourse from his land over the servient owner's land, and if any damage results, the servient owner is without remedy." *Grace Hodgson Tr.*, 569 N.W.2d at 399; *see also Ditch*, 212 N.W.2d at 448; *Hunt v. Smith*, 28 N.W.2d 213, 221 (Iowa 1947) (stating the servient estate "owes a servitude" to the dominant estate "to receive all water . . . as it is shown by the evidence to pass therefrom" because the "owner of the dominant estate is entitled to all the natural advantages of the location and contour of his land").  As our supreme court stated more than one hundred years ago, "the flow of surface water along . . . natural depressions or drains may be hastened, and incidentally increased, by artificial means, so long as it is not diverted from its natural course."

*Lessenger v. City of Harlan*, 168 N.W. 803, 806 (Iowa 1918) (citation omitted) (affirming the dismissal of plaintiff's request for injunctive relief to restrain a city from discharging surface water from its storm sewer along a natural drainage course onto plaintiff's lower-lying land). It was undisputed at trial that the water flowing from Simms Avenue onto the McKees' property was following its "historic drainage path" that, as Michael McKee testified, has been the same "since the beginning of time."

So just because Simms Avenue is dominant to Lot 7 and the north portion of the McKee property does not mean the McKees are entitled to relief, as they seem to claim. Instead, the McKees must meet the exception to the general surface drainage rule: "that if the volume of water is substantially increased or if the manner or method of drainage is substantially changed and actual damage results, the servient owner is entitled to relief." *O'Tool v. Hathaway*, 461 N.W.2d 161, 163 (Iowa 1990) (citation omitted) (describing this as "Iowa's 'natural flow' doctrine"). On that point, the district court found:

> There is no doubt that more water drains through the Simms Avenue outlet after the area was developed than before. But the dominant estate is allowed to drain "additional" water so long as it does not do substantial damage to the servient estate. And clearly, the McKees' property is damaged, but not because of a substantial increase in the volume of water being drained, but because of the velocity of the water exiting the drainage system they installed.

We agree upon our de novo review of the record. *See Anton v. Stanke*, 251 N.W. 153, 155 (Iowa 1933) ("[T]he upper proprietor may drain his land through natural watercourses in a way to increase the water that is to flow over the servient land, providing the increase is not too great or in such unnatural quantities as to be the cause of substantial injury.").

The McKees' expert witness, Jerry Shellberg, testified that when the Northern Oaks Subdivision was constructed, "there was a lot of area added to the drainage area that wasn't there before. I mean, the area was there, but it wasn't directed drainage-wise to the north." He calculated that pre-development, the area being drained from Simms Avenue was two acres, while post-development, it was 7.5 acres. Shellberg explained that by increasing the area, "we increase the velocity, and the velocity creates energy, which erodes the soil, so there's been a lot of soil erosion in that drainage ditch." But on cross-examination, Shellberg agreed that "[j]ust because volume increases, velocity can be controlled." He did not calculate whether the Simms Avenue pipe controlled the velocity of the water coming through it, but he agreed that it was designed according to an accepted ten-year engineering design standard.

The City's expert, Donald Staley, did perform those calculations. But first, he testified the increased area identified by Shellberg was insignificant "relative to the whole drainage basin," which encompassed twenty-seven acres. Staley explained the McKees' northern property is "a very low spot with a lot of large drainage basins surrounding it, and that is a lot of what's contributing to erosion on this property." He also pointed to the loess soil on the property, where "erosion is just a natural phenomenon." Staley testified that "as far as erosion goes, the main thing that you want to control as a civil engineer is the velocity of flow over the area." One way to control erosion is to throttle, or slow, the flow of water from a drainage pipe by flattening the slope of the pipe. Staley testified that the 24-inch pipe at the Simms Avenue outlet was installed at half-a-percent grade, which he said slowed the "initial discharge velocity that was coming off the Northern Oaks

piping system [to] somewhere under three . . . feet per second, which is kind of the magic number" under engineering standards. But when the McKees hooked their 180-feet of 24-inch pipe onto the Simms Avenue outlet, Staley said they put their pipe in at a "very, very steep slope." That steep slope "significantly increased . . . the velocity coming out." The city engineer and public works director, Matthew Cox, agreed with Staley. He testified that because the McKees installed their pipe on Lot 7 "at a steeper slope, that would accelerate the water coming out the end."

Based on this testimony, we agree with the district court that "the McKees have suffered erosion from drainage conditions that they either created or by actions they delayed in taking." This is not a finding that the McKees' equitable relief was barred by their contributory negligence, as they argue on appeal. *See, e.g.*, *A.D., L.L.C.*, 2014 WL 6680884, at *9 (rejecting dominant estate owner's argument that the Iowa Comparative Fault Act barred the servient estate owner from any recovery). Instead, the court was properly determining whether the City's actions substantially increased the volume of water moving across the McKees' lower-lying property or substantially changed the manner or method of drainage. *See Grace Hodgson Tr.*, 569 N.W.2d at 399. That was the key issue underlying the McKees' claim in count two, which the court decided adversely to them. We affirm that decision.

## B. Count Three—Private Nuisance

In count three of their amended petition, the McKees alleged the City "designed and approved th[e] stormwater collection and outlet system" at Simms Avenue "without any consideration it would have on the McKees' property." Their

claim has evolved on appeal, where they now assert the private nuisance "was for the City's failure to install drainage infrastructure on the McKee property north of Lot 7 despite the increase in stormwater volume caused above." Either way, we agree with the district court that the McKees are not entitled to relief on this count.

"A private nuisance is 'an actionable interference with a person's interest in the private use and enjoyment of the person's land.'" *Weinhold v. Wolff*, 555 N.W.2d 454, 459 (Iowa 1996) (citation omitted); *see also* Iowa Code § 657.1(1) (2023) ("Whatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere unreasonably with the comfortable enjoyment of life or property, is a nuisance. . . ."). Civil actions "may be brought to enjoin and abate [a] nuisance and to recover damages sustained on account of the nuisance." Iowa Code § 657.1(1). "The burden of proof is on the plaintiff 'to establish by a preponderance of evidence the existence of a defendant created nuisance which was a proximate cause of resultant damages to person or property as alleged.'" *Brockman v. Ruby*, No. 18-0170, 2018 WL 6338632, at *3 (Iowa Ct. App. Dec. 5, 2018) (citation omitted).

For many of the same reasons stated above, we agree with the district court that the McKees failed to meet their burden. Those reasons include the highly erodible soil on the McKees' property, the increased velocity of water from the drainage system the McKees installed on Lot 7, and the topography of the area. As the court found, the evidence established that "the McKee property is the natural drainage pathway from several directions within the surrounding area." While the McKees contest some of these points by citing testimony from their

expert, the court implicitly found the City's expert to be more credible. We give deference to that finding upon our de novo review of the record. *See id.*

Credibility findings also led the district court to conclude

that the Northern Oaks Subdivision, Simms Avenue reconstruction and stormwater inlet plans submitted by Duggan and approved by the City were designed and constructed within acceptable engineering standards and do not jettison substantially more water down the drainage than before development, some water yes, substantially more, no. The Court is fully convinced that the initial construction was designed to engineering standards to effectively slow the velocity of water, using a grading system of 0.5%, before discharging it onto the McKee property. From there, the more convincing evidence demonstrates that the McKees' improvements then accelerated the flow of water toward the north of their property resulting in damage.

Under Iowa Code section 670.4(1)(h),[3] a municipality is immune from liability for claims "based upon or arising out of a claim of negligent design or specification, negligent adoption of design or specification, or negligent construction or reconstruction of a public improvement," so long as the improvement was "constructed or reconstructed in accordance with a generally recognized engineering or safety standard, criteria, or design theory in existence at the time of the construction." Both experts testified that the initial drainage system installed at Simms Avenue was completed using accepted engineering standards in existence at the time. The McKees argue this testimony is not determinative because their private nuisance "claim is for the lack of any

---

[3] While the district court didn't expressly state that it was rejecting the McKees' private nuisance claim under the immunity granted to the City by Iowa Code section 670.4(1)(h), its findings support that conclusion. In any event, the City urged that alternative ground in district court and on appeal. *See Hawkeye Foodserv. Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 609 (Iowa 2012) (noting we may affirm a district court's ruling on a proper ground urged but not relied upon by the court).

infrastructure at all north of Lot 7—not the infrastructure that dumps additional water down the McKee property from above." Because we have already determined the City did not have a duty to install infrastructure north of Lot 7, we reject this argument and affirm the court's dismissal of this claim.

### C.      Count Four—Pure Nuisance

This leaves the McKees with their pure nuisance claim. To establish that claim, the McKees needed to "demonstrate a degree of danger (likely to result in damage) inherent in the thing responsible for the harm, beyond that arising from mere failure to exercise ordinary care in its use." *Kellogg v. City of Albia*, 908 N.W.2d 822, 830 (Iowa 2018) (cleaned up). "[A] pure nuisance claim based on harm inherent in an activity falls outside the immunity statute." *Id.* The inherent danger must stem from the activity engaged in by the defendant, not the activity's consequences. *Id.*

The McKees claim the "stormwater volume increase is a pure nuisance." The district court rejected that claim, reasoning that "because the Court has already found that the City's approval of the plan did not create or generate a substantial increase in stormwater volume upon the historic drainage path after the development was constructed, their claim for pure nuisance fails as well." We reached the same conclusion on our de novo review of the record and affirm the court's dismissal of the McKees' pure nuisance claim on that ground. We also affirm on the alternate ground urged by the City—that "[s]tormwater volume increase is not pure nuisance because the danger is not inherent in [the] thing itself." *See Hawkeye Foodserv. Distrib., Inc.*, 812 N.W.2d at 609.

In *Kellogg*, the court found that the plaintiff presented no evidence that the City's storm sewer system was inherently dangerous beyond the dangers associated with failing to upgrade the pipe to handle an increased water flow. 908 N.W.2d at 830 (finding the plaintiff's focus on the dangers of a wet basement, such as mold, is not inherently dangerous). The same is true here. Beyond the dangers associated with failing to install erosion control, the McKees did not offer any evidence that the City's drainage system at Simms Avenue is inherently dangerous. *Cf. Martins v. Interstate Power Co.*, 652 N.W.2d 657, 658 (Iowa 2002) (holding that "[e]xcessive stray voltage from an electric utility resulting in damage to a dairy herd" is an inherent danger). Like in *Kellogg*, the McKees focus on the "activity's consequent irritants," not the activity itself. 908 N.W.2d at 830. While the McKees claim that increasing the volume of stormwater creates the inherent danger of erosion, both experts testified that if the McKees had used proper engineering standards in their pipe addition, the erosion would not have occurred. So their pure nuisance claim also fails on this alternate ground.

## IV.    Conclusion

Upon our de novo review of the record, and giving weight to the district court's factual and credibility findings, we agree with the court that the McKees are not entitled to relief. We accordingly affirm the court's dismissal of their claims.

**AFFIRMED.**