**Mary DITCH, Appellee,**

v.

**Charles E. HESS et al., Appellants.**

**No. 55913.**

Supreme Court of Iowa.

Nov. 14, 1973.

George C. Claassen, Cedar Rapids, for appellants Hess.

George J. Novak, Cedar Rapids, for appellants Holec.

Mike Wilson, Des Moines, for appellee.

Heard before MOORE, C. J., and MASON, RAWLINGS, UHLENHOPP, and McCORMICK, JJ.

UHLENHOPP, Justice.

This appeal involves a problem of surface water on six pieces of real estate—four farms, a lane, and ,a railroad right-of-way. The accompanying sketch shows the six pieces, which lie between Iowa Highway 13 and the Cedar River in Linn County, Iowa. The area in question is quite flat.

Surface water flows from high ground northeast of the highway to the southwest. Elevations on plats show that in a natural state, most of the water in the general area where a culvert now crosses the highway must have flowed approximately west onto what is now the Reilly land and a lesser amount must have flowed onto what is now the Ditch land. In the present litigation, we are concerned with the water which comes through this highway culvert. Southeast of the culvert are three other water passageways under the highway, admitting water onto the Ditch land. We are only incidentally concerned with that water, in connection with a damage claim.

The highway, then called Bertram road, was established many years ago. One Hormel owned the land in this area from the highway to the river. At some time a railroad was constructed across the Hormel land, about a hundred rods southwest of the highway. The railroad builders placed two pipes northeast-southwest under the railroad near the south corner of what is now the Reilly land. Those pipes were evidently to take care of some of the water from the waterway in question and other water in the vicinity of the pipes. In addition, the builders placed a north-south culvert under the railroad southeast of what is now the Ditch land. The flow of water in the pipes and culvert is toward the river.

Eventually the Hormel land was divided into four parcels, owned by four different people—two parcels between the highway and the railroad and the other two between the railroad and the river. The owners of the two parcels adjoining the highway conveyed a strip of land between their farms to the owners of the two parcels by the river, for use as a lane to the highway. Where the lane crossed the railroad, two northwest-southeast pipes were placed under the lane, one on each side of and parallel to the railroad. The flow in the pipe on the Ditch-Reilly side of the railroad is northwest toward the two pipes running under the railroad. The flow in the pipe under the lane on the Holec side of the railroad is southeast.

In the days before the lane was improved, the water which came through the highway culvert ran mainly onto the lane and the Reilly land, but some also ran onto the Ditch land. Part of the water ponded in depressions. That which did not evaporate into the air or percolate into the soil eventually found its way through the two pipes under the railroad near the corner of the present Reilly farm and thence into the railroad ditch on the southwest side of the railroad and also onto the land which now comprises the Holec and Hess farms.

Later the owners of the lane improved and raised it a little. In the course of time, silt raised the land at the sides of the lane from the railroad northeasterly. As a result, water from ordinary precipitation ceased to spread out on the Reilly land near the highway culvert, but ran southwest along the Ditch side of the lane for a distance. Most of it then went onto the lane or crossed to the Reilly side. A 1929 survey showed that where the lane joins the highway, the lane elevation was 97.5 feet and the elevation of the land beside the lane on the Ditch side was 95.0 feet. Proceeding southwesterly along the lane for 800 feet, the comparative elevations were 75.8 and 75.3, at 900 feet they were 74.0 and 74.0, and at 1,000 feet (about two-thirds way to the railroad) they were 73.7 and 73.1. During high water around 1929, therefore, the lane must have been flooded, at least around the 900-foot point, and adjacent lands also must have had water. Considerable water would have been on the present Reilly land, some would have been on the lane, and some would have been on the Ditch land. The water on the Reilly land which did not pond would eventually find its way southwest through the two pipes under the railroad. The water on the Ditch side which did not evaporate or percolate would cross to the Reilly side at a low point in the lane or find its way to the railroad on the Ditch side, thence northwesterly in the pipe un-

der the lane, and thence southwesterly in the pipes under the railroad.

Southeast of the lane, the owners of the Ditch farm laid tile southeast through the corner of the adjoining farm to the separate southeast culvert under the railroad.

In that state of affairs, the surface water situation on the farms was tolerable— for the river-bottom farms that they are. But the condition of the lane was very bad for travel in wet weather, especially in the area about 900 feet south of the highway.

In 1953 Francis M. and Mary Ditch owned their farm and R. E. and F. N. Stepanek owned what is now the Hess farm. Endeavoring to improve the lane, Stepaneks raised its level. The result was additional water on the Ditch land. Stepaneks desired to improve the lane further. Ditches sued Stepaneks and prayed that they be enjoined from raising the lane any more and be required to restore the lane to its previous level. Before that case was tried, however, Stepaneks sold their farm to Charles E. and Maude K. Hess. Stepaneks could not furnish good title because of the pending suit and in 1956 agreed with Hesses to furnish $500 to get the drainage dispute resolved with Ditches. Hesses and Ditches then entered into a contract settling the course of drainage substantially as Ditches now claim and agreeing to alterations so that the waterway would be unobstructed.

Stepaneks and Ditches thereupon had workmen lay a 48-inch, 35-foot steel tube across the lane at about a 45-degree angle in a depression approximately 660 feet southwest of the highway. The intake end of the tube on the Ditch side was farther northeast than the discharge end on the Reilly side. On the lane, the workmen built up earth to the sides of the tube so that vehicles could pass over. About a month later, the workmen built a curved concrete wing from the tube upstream on the Ditch side, so as to put the water into the tube, and a similar wing downstream at the opposite end, to head the water down that side of the lane. Stepaneks paid for the improvement, and Ditches dismissed their suit against Stepaneks. Thereupon Stepaneks conveyed to Hesses.

The tube and concrete wings did not accomplish their purpose very well. The second wing (on the Reilly side) deflected some water back onto both the lane and the Ditch land. A ditch was not maintained on the Reilly side of the lane to take the water southwest. Eventually silt and debris in the tube and on the adjoining area reduced the efficiency of the improvement, and still more water went onto the Ditch land. In 1959 Ditches cleaned out the tube and adjoining area and piled the soil and debris along their fenceline adjoining the lane for a distance of about 100 feet southwest. Thereafter the water running through the tube went partly on the Reilly land and partly on the lane. Reillys were dissatisfied about having the water on their land, and Hesses, who lived on their farm and used the lane continually, were dissatisfied about having the water on the lane. Holecs were probably dissatisfied, too, but they lived elsewhere and seldom personally used the lane.

In 1961 Reillys sued Ditches, Hesses, and Holecs on account of the water flowing onto the Reilly land. On January 15, 1963, the district court (Penningroth, J.) denied relief except to enjoin Hesses from raising the level of the lane.

In April 1963 Hesses had workmen, using dynamite, blow out the concrete wings which had been installed in 1956. The next year, Hesses also removed the 48-inch tube under the lane. In addition, Hesses and Holecs improved the lane, raised it somewhat, and placed 610 tons of crushed rock on it. As a result, the lane was good but water could not cross it. The water spread out on the adjacent part of the Ditch farm, causing erosion, fence damage, and crop losses. Ditches' crop losses between 1963 and 1966 amounted to $4,537.-44.

In 1968 Mary Ditch, then sole owner of the Ditch farm, commenced the present suit against Hesses to recover crop damage and to require restoration of the free flow of water from the Ditch side of the lane. Mrs. Ditch subsequently joined Holecs as defendants. After trial, the trial court (1) granted Mrs. Ditch damages of Hesses in the amount of $4,537.44 and interest, (2) ordered Hesses to restore the 48-inch pipe and the concrete wings, to establish a ditch along the lane from the highway culvert to the 48-inch pipe and from the discharge end of the 48-inch pipe to the railroad, and to keep those ditches clear, (3) permitted Mrs. Ditch to make those improvements at Hesses' expense if they failed to do so within 90 days, (4) enjoined Hesses and Holecs from interfering with such drainage, and (5) retained jurisdiction. Hesses and Holecs appealed.

At the outset, Hesses and Holecs contend that the decree, if carried out, would embroil them in litigation with Reillys and the Railroad. They say that under the decree, the water will be cast upon the lands of Reillys and the Railroad as an outlet in greater quantities and velocities than in a natural state. They assert that essentially the decree solves Mrs. Ditch's water problem by casting the water on the lands of proprietors who are not parties to this litigation.

This contention raises a question of indispensable parties. Determination of the indispensable party question has three parts. First, under the law who is an "indispensable" party? Second, under the evidence are Reillys and the Railroad indispensable parties? And third, if they are, what disposition shall we make of the appeal?

The appeal also presents some contentions by Hesses and Holecs which do not involve the indispensable party complication and may be resolved in any event.

I. *Indispensable parties.* First, then, who is an "indispensable" party? Rule 25(b) of our Rules of Civil Procedure states:

A party is indispensable if his interest is not severable, and his absence will prevent the court from rendering any judgment between the parties before it; or if notwithstanding his absence his interest would necessarily be inequitably affected by a judgment rendered between those before the court.

See also Wright v. Standard Oil Co., 234 Iowa 1241, 1245, 15 N.W.2d 275, 277 ("an indispensable party is one having an interest in the controversy of such a nature that a final decree cannot be made without affecting that interest"); Provident Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (federal rule on the subject); 59 Am.Jur.2d Parties § 13 at 360 (same as Wright rule, supra); 67 C.J.S. Parties § 1f(3) at 892 ("An indispensable party is a party who has such an interest in the controversy or subject matter that a final adjudication cannot be made, in his absence, without injuring or affecting such interest.").

Second, are Reillys and the Railroad indispensable parties under the evidence before us? This question requires us to find from the evidence whether the course of drainage is or is not such that the water should be transferred from the Ditch to the Reilly side of the lane and then be taken to the railroad, as the trial court decreed. If the trial court was wrong in that, the decree must be reversed and the presence of Reillys and the Railroad is not essential. But if the trial court was right, then we are directly confronted with the indispensable party problem. If we do find that the trial court was right we do not render a final adjudication on the course of drainage, for Reillys and the Railroad are not parties and not bound; we find the course of drainage only to ascertain whether Reillys and the Railroad are indispensable parties. We launch, therefore, into the question of the course of drainage of this surface water, as

shown by the evidence introduced by the parties now before the court.

■ The general principle of law is "that the owner of the upper or dominant estate has a legal and natural easement in the lower or servient estate for the drainage of surface waters, that the natural flow or passage of the waters cannot be interrupted or prevented by the servient owner to the detriment or injury of the dominant proprietor . . . and that the owner of the dominant estate may cast an additional quantity of surface water upon the servient estate; if in so doing, he does not thereby do substantial damage to the servient estate." Witthauer v. City of Council Bluffs, 257 Iowa 493, 498, 133 N. W.2d 71, 74–75. See Rosendahl Levy v. Iowa State Highway Comm'n, 171 N.W.2d 530 (Iowa); Dodd v. Blezek, 245 Iowa 1112, 66 N.W.2d 104.

Applying this principle of law, what is the direction of flow of the surface water? From earliest times this water flowed generally west from where the highway culvert is now located and onto what is now the Reilly land, although some also went onto what is now the Ditch land. Part that coursed onto the Ditch land seeped into the soil or evaporated and part eventually found its way to the Reilly land.

The early improvements gave effect to that drainage. The railroad builders placed two pipes under the railroad from what is now the Reilly land, with the flow line in the direction of the river. When the crossing of the lane and the railroad was constructed, the lane builders laid the northeast pipe under the lane with a flow line from the Ditch to the Reilly side and toward the two pipes under the railroad. Under the principle of law which we have quoted, the owners of the Ditch land had a right to have the water move in the direction of the Reilly land and also to improve drainage toward that end, so long as they did not do substantial damage to the Reilly land. But the Ditch land had to take some water at flood time. As to that water,

which was a small proportion of the whole, the Ditch land is not dominant.

The dispute involves more, however, than the Ditch and Reilly lands. The Hess-Holec lane introduces complications, for the owners of the lane want it higher than surrounding land in order to improve travel. Stepaneks appear to be the first ones to raise the lane materially. The effect of so doing was to turn a largely unimproved way into a low dike, preventing the water from freely spreading onto the Reilly land. Ditches sued and eventually secured restoration of drainage, although by artificial means, and Judge Penningroth denied Reillys damages after that means was in operation. But Judge Penningroth also required Hesses to leave the lane at its then level to permit some movement of water. The matter was thus supposedly at rest, but Hesses, and Holecs to a lesser extent, remained dissatisfied with the condition of the lane.

■ The lane has two aspects. One aspect relates to water on the lane itself. In this respect the lane is different from surrounding servient land. We think Hesses and Holecs are right that they are entitled to have the lane in usable condition. When the original grantors conveyed the lane, they must have understood it would be made suitable for passage. McDonnell v. Sheets, 234 Iowa 1148, 15 N.W.2d 252; Miller v. Kramer, 148 Iowa 460, 126 N.W. 931.

■ The other aspect relates to the lane as a dike between the Ditch and Reilly properties, obstructing natural drainage. We cannot say the grantors contemplated that the lane should have that effect. In this aspect, the lane is similar to a highway or a railway. If its traveled surface is raised above adjoining land, the lane must be ditched and must have transverse bridges, culverts, or pipes which will permit free passage of water from one side to the other. See Hinkle v. Chicago, R. I. & P. Ry., 208 Iowa 1366, 227 N.W. 419; 56

Am.Jur. Waters § 75 at 562; 93 C.J.S. Waters § 118 at 818.

Contrary to Judge Penningroth's decree, Hesses—and Holecs with them—raised the lane. To compound the problem, Hesses not only failed to construct necessary water passageways through the lane, they tore out the substantial passageway and walls previously installed.

Confronted with this situation, the trial court in this case left the lane at its present elevation. Hence the lane will remain passable. But the trial court required Hesses to restore the 1956 passageway through the lane and also to dig and maintain ditches. As among the present parties to the litigation, the decree appears to be a practical working out of the water problem. True, the trial court might have ordered the passageway for water under the lane to be placed at a different location, but the court ordered it to be placed at a depression where the 1956 one had been, which appears a satisfactory place. True also, the trial court might have required an additional passageway or passageways to be placed under the lane farther southwest, but this is largely a matter for Reillys and the Railroad to raise rather than Hesses and Holecs. The trial court necessarily held also that Ditches acted within their rights when they placed dirt and debris on the Ditch land adjoining the lane. Although this material undoubtedly does turn water, for present purposes we hold that Ditches' action comes within the principle that the dominant proprietor may cast additional water on the servient land if he does not do substantial damage. Witthauer v. City of Council Bluffs, 257 Iowa 493, 133 N.W.2d 71. Judge Penningroth's decree denying Reillys damages of Ditches necessarily means that Ditches did not do such damage.

Our conclusion, then, solely for the purpose of determining the indispensability of parties, is that the trial court's decree appears proper as among the present litigants. What will be the effect of the decree if carried out?

In a state of nature the water spread out, seeped in or evaporated, or moved westerly. Under the decree this water will be gathered together, be channeled down the Reilly side of the lane in a ditch, and be cast on the railroad right-of-way. The velocity and amount of water along the Reilly side of the lane and at the railroad will undoubtedly increase. The tubes under the railroad, northwest of the crossing, may not take the water as fast as it comes, and ponding may occur in the southern part of the Reilly land. If these things take place, will Reillys and the Railroad be able to show that they have sustained "substantial damage" so that the waterflow must be reduced or halted? Or will Ditches be able to show that the improvement in drainage is within the extent permitted the proprietor of the dominant estate? Or will Reillys and the Railroad adduce different proof about the course of drainage resulting in a different determination of the facts?

Whoever might prevail in such future litigation, the evidence makes clear that if Hesses carry out the trial court's decree, the interests of Reillys and the Railroad will be affected. Hence Reillys and the Railroad are indispensable parties to disposition of the water question, under rule 25(b) and Wright v. Standard Oil Co., 234 Iowa 1241, 15 N.W.2d 275.

Third, since Reillys and the Railroad are indispensable parties, what disposition should we make of the appeal? Rule 25(c) states, "If an indispensable party is not before the court, it shall order him brought in." Does this mean that indispensable parties are to be brought in even if the question first arises in the appellate court? Jurisdictions answer this question in various ways. 5 Am.Jur.2d Appeal & Error § 588 at 56; 4 C.J.S. Appeal & Error § 264b at 796. We are clearly with those which answer the question affirmatively. The leading case in Iowa is Tod v. Crisman, 123 Iowa 693, 99 N.W. 686. A more recent decision is City of Ce-

dar Rapids v. Cox, 250 Iowa 457, 466, 93 N.W.2d 216, 221. This court there stated:

It is well settled in this state that lack of indispensable parties may be raised for the first time upon appeal from the judgment. Where the point is well taken the cause is not dismissed but remanded to the trial court for the purpose of bringing in the party or parties found to be indispensable.

See also Whitmer v. Board of Directors of Independent School Dist. of White Pigeon, 210 Iowa 239, 244, 230 N.W. 413, 415 ("we remand the case to the trial court, with directions that, if the plaintiff still desires an adjudication upon the question attempted to be litigated, he shall make all interested parties, including both districts, parties to the suit"); Crosby v. Davis, 9 Iowa 98, 100 ("judgment is reversed and cause remanded to the District Court with leave to the plaintiff to amend his petition and make other parties"); Postlewait & Creagan v. Howes, 3 Iowa 365, 380 ("The better practice is to remand the cause, with leave to complainant to bring in the necessary parties.").

We hold, therefore, that the case must be remanded to the district court, with leave to Mrs. Ditch to bring in Reillys and the Railroad and anyone else interested in the controversy.

II. *Issues Among Present Parties.* Hesses and Holecs advance several propositions on the merits which are susceptible of determination among present parties The propositions are largely factual.

■ Hesses contend, with reference to Mrs. Ditch's crop damage claim especially, that the water which caused the damage came from three pipes under the highway southeast of the highway culvert. The evidence shows, however, that the water from those three pipes did not cause crop damage in the area in question in previous years. That water went more to the southeast part of the Ditch farm which is tiled. Ditches started having crop damage when Hesses had the cement wings blown up and the 48-inch pipe removed. We are satisfied the trial court was right that Hesses' acts caused the crop damage. The trial court properly rendered judgment against Hesses for $4,537.44.

Hesses also contend in connection with the damage issue that the operator of Mrs. Ditch's land was a tenant, not a cropper. But the evidence shows the latter, as the trial court held.

■ Holecs urge that they did not execute the Ditch-Hess contract settling the Ditch-Stepanek lawsuit and are not bound by it. Hesses argue that the contract is invalid because Mr. Hess signed it for both himself and his wife. Mr. Hess did sign it for both of them, and the evidence shows he had authority to do so. But Hesses were acquiring the Stepanek farm as their homestead with proceeds from their previous homestead, and they say they both had to sign the contract personally to make it valid, citing §§ 561.13 and 561.20, Code 1973. See also Blakeslee v. Paul, 212 Iowa 1385, 238 N.W. 447; Keeline v. Clark, 132 Iowa 360, 106 N.W. 257. We do not decide the binding character or the effect of the contract with reference to disposition of the water, because of the absence of indispensable parties. On the basis of estoppel, we do think the contract binds Hesses as to Mrs. Ditch's damage claim. Sawyer v. Perry, 62 Iowa 238, 17 N.W. 497; Truro Savings Bank v. Foster, 206 Iowa 432, 220 N.W. 20; Clark v. Chapman, 213 Iowa 737, 239 N.W. 797.

We have carefully considered all of the other propositions which Hesses and Holecs raise, but we do not find merit in them.

We therefore affirm the decree as to these issues among the parties themselves including the award of damages to Mrs. Ditch, but as to the disposition of the wa-

ter we reverse and remand for want of indispensable parties, with leave to bring them in.

All court costs to date are taxed two-thirds to plaintiff and one-third to Hesses.

Affirmed in part, reversed in part, and remanded.