W.C. MAISEL, Plaintiff–Appellee,

v.

Gilbert W. GELHAUS and Margaret E. Gelhaus, Defendants–Appellants.

No. 85–1208.

Court of Appeals of Iowa.

Sept. 30, 1987.

Gordon D. Greta of Greta & Greta, P.C., Eldora, for defendants-appellants.

John L. Butler of Lundy, Butler & Lundy, P.C., Eldora, for plaintiff-appellee.

Heard by DONIELSON, P.J., and SCHLEGEL and HAYDEN, JJ.

DONIELSON, Presiding Judge.

The defendants, Gilbert and Margaret Gelhaus, appeal from the judgment of the district court awarding the plaintiff, W.C. Maisel, damages and injunctive relief against the defendants resulting from a dispute over drainage of water near the parties' common boundary. The district court additionally dismissed the Gelhauses' counterclaim against Maisel. On appeal, the Gelhauses challenge the sufficiency of the evidence to demonstrate that their actions had caused drainage problems while Maisel's actions had not. The Gelhauses contend that Maisel has not demonstrated that he has suffered any damages or was entitled to injunctive relief, nor has Maisel demonstrated that his land is the dominant estate and the Gelhauses' land is the servient estate. The Gelhauses additionally argue that the district court erred by refusing to make an on-site inspection of the premises, in refusing to sequester witnesses, and by admitting hearsay testimony that a previous owner of their farm had approved of Maisel's alteration of a watercourse. We affirm.

The Gelhauses' property is adjacent to and immediately south of the Maisel property. The two properties are separated by a fence line. A north-south county gravel road lies to the west of both parties' property. The following sketch shows the relative positions of the tracts of land in question:

Maisel is approximately seventy-three years of age and has farmed most of his life. Maisel has owned the farmland north of the fence line since 1942. Gilbert Gelhaus is approximately sixty-one years of age and has farmed all of his life. The Gelhauses purchased the farm south of the fence line in 1972 from one George Dannenberg. The Gelhauses took possession of the Dannenberg farm in 1973 and started farming it that same year. Prior to 1973, the Gelhauses lived on a farm a short distance to the north of the Dannenberg property.

The natural waterflow in the tracts in dispute flows from the southwest to the northeast to where the county gravel road is now located at or about where an extension of the fence line would intersect the gravel road. The natural flow then passes under the gravel road through a culvert and then fans out to the northeast, east, and southeast. Most of the water flowing to the northeast would go to the northeast across Maisel's farmland. This water would then drain to the southeast across the Gelhaus farmland. This natural waterflow intersects with the fence line at approximately fifty-eight rods east of the gravel road. The water district tile runs across the Maisel farmland and then across the Gelhaus farmland to the southeast where it outlets into an open drainage ditch approximately two or three miles southeast of the Gelhaus property.

The previous owner of the Gelhaus property, George Dannenberg, maintained a dirt and grassy lane to the south of the fence. This lane proceeded from a field driveway in the northwest corner of the farm and ran to the east immediately to the south of the fence line. This driveway did not contain a culvert and acted as a dam to water flowing in the ditch and water flowing from the culvert under the gravel road.

In 1966, Maisel changed this waterway by constructing a channel immediately to the north of the fence line. This channel extended for approximately twenty-five rods from the gravel road. At trial, over the Gelhauses' hearsay objection, Maisel testified that this channel was dug with the consent and cooperation of George Dannenberg, who is now deceased. Maisel testified that the channel was dug so that he could maintain weed control in the southwest corner of his farmland and utilize the land to the north of the channel. Maisel testified that Dannenberg acquiesced to the alterations because he wanted that corner of his property cleaned up so that he could farm that section of land he had not otherwise been able to use.

The Gelhauses commenced farming the Dannenberg farm in 1973. At that time the Gelhauses plowed the dirt and grass lane to the south of the fence and began to moldboard plow the land in an east-west direction. Dannenberg had previously plowed in a north-south direction. In 1975, the north-south gravel road was regraded by the county, during which process the field driveway at the northwest corner of the Gelhaus property was removed. At the request of the Gelhauses, the county placed a new field driveway on the west side of the Gelhaus property to the south of the fence line at a top of a rise to the south of the culvert under the road. As a result, the water began to flow in a northerly direction. No culvert was constructed under the new driveway at the Gelhauses' request.

In 1976, at Maisel's request, the county constructed an earthen dike in the road ditch on the east side of the road and to the north of the culvert under the road, which blocked the flow of water north into the road ditch. In 1977, Maisel cleaned out the ditch and waterway north of the fence line due to silting in the waterway. The waterway was cleaned out to the level of the culvert under the gravel road. The Gelhauses objected to cleaning of the ditch at this time. During this period, the county drainage trustees, aware of the complaints filed by Maisel concerning the plowing methods of Gelhaus, contacted the Gelhauses and requested that they plow away from the fence line. Mr. Gelhaus stated to the trustees that he would do so, but because of a wet spring, he failed to do so.

Water erosion in Maisel's man-made channel has resulted in large boulders be-

ing exposed at the east end of the waterway. In addition, James Weig, the present farm tenant on the Maisel property, placed smaller rocks found in the field in the east end of the waterway. The testimony by various witnesses at trial revealed that the rocks have not caused the surface waters to change their direction.

In 1983, the Gelhauses restored the dirt lane to the south of the fence line. That same year a portion of the northwest corner of the Gelhaus property was set aside pursuant to a government program, such area being seeded. In the fall of 1983, an "L"-shaped area in the northwest corner of the Gelhaus property was seeded for hay and now preserves the grade in the area and controls the surface drainage in that area. Approximately thirty acres of the Gelhaus farmland is subject to flooding during heavy rains. Fifteen of those acres are located in the northeast corner of the Gelhaus property next to the fence line. Another fifteen are located in the north central portion of the Gelhaus property. The water from both of these areas drains to the southeast in drainage tiles.

The trial court in the present case entered its decree on August 12, 1985. The trial court found that the Maisel property was the dominant estate, that the method of plowing utilized by the Gelhauses resulted in an elevation of the land to the south of the common fence line, resulting in a diking effect and altering the natural waterflow. The trial court thus found that the flooding resulting from Gelhaus's farming practices had resulted in Maisel sustaining cash rental loss in the amount of $1,600.00. The trial court further entered an injunction against the Gelhauses ordering them to remove the diking effect of the elevated fence line. From this decree, the Gelhauses have appealed.

■ Because the present case was tried before the trial court in equity, our scope of review is de novo. Iowa R.App.P. 4. In equity cases, especially when considering the credibility of the witnesses, we give weight to the fact findings of the trial court, but we are not bound by them.

We first address the Gelhauses argument that the trial court erred in finding that Maisel's land is the dominant estate and the Gelhauses' land the servient estate. The Gelhauses contend that the water historically flowed broadly and gently from the road culvert to the northeast, then broadly to the east, and then ultimately flowed broadly to the southeast. The Gelhauses argue that the water's turn to the southeast occurred much farther to the east of the fence line and that the water flows presently in a more southerly direction because of Maisel's man-made channel and plowing practices.

■ A plaintiff bringing an action such as one in the present case has the burden to prove by a preponderance of the evidence that his or her land is the dominant estate and that the defendant's land is the servient estate. *Witthaur v. City of Council Bluffs*, 257 Iowa 493, 497–98, 133 N.W.2d 71, 74 (1965). With regard to ordinary surface waters, the relative elevation of the respective tracts determines which is the dominant and which is the servient estate. *Id.* at 498, 133 N.W.2d at 74; *Downey v. Phelps*, 201 Iowa 826, 832, 208 N.W. 499, 502 (1926).

Upon careful examination of the record, the numerous pictorial exhibits, and extensive evidence reviewed in the parties' briefs, we think little would be gained by a further detailed examination of the testimony, photographs, or maps. We agree with the trial court that the greater weight of evidence supports Maisel's position that his land was the dominant estate and the Gelhauses' land was the servient estate. The numerous witnesses called to testify at trial all stated that the natural flow of water goes from the northeast, then east, then southeast across the fence line into the Gelhaus land. Additionally, Mr. Gelhaus on cross-examination admitted that the flow of water across his land was coming from the higher tract of land, that being the Maisel property.

The Gelhauses next contend that the trial court erred in finding that they had caused a damming effect along a certain portion of the fence line between the Gelhaus and

Maisel lands. The Gelhauses contend that they did not plow toward the fence consistently every year, but rather alternated their plowing. The Gelhauses further maintain that the fence line has not been raised at all. The Gelhauses argue that when the fence was originally constructed in 1966, there existed a foot between the bottom wire and the soil, that such distance remains today, and that therefore no consistent plowing towards the fence line could have occurred. We disagree.

■ It is a well settled principle in Iowa that the owner of the dominant estate has a legal or natural easement in the servient estate for the drainage of surface waters. *Moody v. Van Wechel*, 402 N.W. 2d 752, 757 (Iowa 1987); *Ditch v. Hess*, 212 N.W.2d 442, 448 (Iowa 1973); *Witthauer v. City of Council Bluffs*, 257 Iowa 493, 498, 133 N.W.2d 71, 74–75 (1965). The natural flow of water cannot be interrupted by the servient owner so as to cause injury to the state of the dominant owner. *Ditch*, 212 N.W.2d at 448. Though the landowner may divert water by surface drainage onto the servient estate even though an additional amount of water may therefore enter the servient estate, it has been duly recognized that the dominant owner may not discharge such water so as to do substantial damage to the servient estate. *Moody*, 402 N.W.2d at 757; *Ditch*, 212 N.W.2d at 448.

In the present case voluminous testimony and photographic exhibits were offered at trial in support of each party's position. Hollis Ryken, a registered civil engineer and land surveyor who has frequently surveyed drainage projects for Hardin County, testified that it was his opinion, after surveying the land in question, that there had been a uniform buildup of soil all along the fence line, but that the most significant buildup occurred at station 4 + 50, or about twenty-five rods from the drainage ditch. Ryken testified that in his opinion the plowing methods allegedly used by the Gelhauses had raised the fence line from five inches to one foot, though Ryken also testified that he believed the height of the dam at the station 4 + 50 area of the fence

line was approximately two feet, deriving such measurement from the "original ground line before the fence was put in up to the top where the fence is now." Ryken testified that at the 4 + 50 station the natural waterflow would cross the fence line at approximately that point, but because of the built-up area of soil south of the fence line, this blockage was damming the water north onto the Maisel property. Ryken, however, also testified that silting from the natural flow of drainage did occur in the area of significant damming at the 4 + 50 station area. Ryken testified that the slope south of the fence line averaged between 5% and 7½%, but that at the 4 + 50 station area that slope was approximately 8.8%.

James Weig, a farmer who farmed the disputed property in question at the time the drainage ditch was constructed in 1966, testified that the previous owner of the Gelhaus property plowed the land in a north-south direction, but that the Gelhauses plowed the land east to west towards the fence. Weig testified that at no time did he ever observe Gelhaus plow away from the fence. Arnold Krueger, a farmer who had owned farmland east of the Gelhaus property at the time in question, testified that the previous owner of the Gelhaus land plowed the land north and south, while Gelhaus plowed the land in an east-west direction against the fence. Krueger did testify that while he did not personally see Gelhaus plow the land, he always observed the land to be plowed against the fence. Krueger also testified though he never actually measured the slope of the fence line, he believed that the fence line had been raised about a foot.

Oswell Fisher, a drainage district trustee, testified that in 1983 he went to the Gelhaus property to speak with Gelhaus about his plowing practices, doing so after receiving several complaints from Maisel. Fisher testified that he observed the land to be cultivated towards the fence line and testified that he formed this opinion after observing the slope of the land at the fence line. Arlo Ziebell, another drainage district trustee, testified that the Gelhaus land is

currently being plowed against the fence in an east-west direction.

Gilbert Gelhaus testified that he plowed his land in an east-west direction, but would alternately plow towards and away from the fence. Gelhaus testified that the drainage district trustees had asked him to plow away from the fence line in order to "ease the situation," but that due to wet conditions in the spring he never did plow away from the fence. Gelhaus additionally pointed out that the fence itself has not changed in appearance since it was first constructed in 1966, which would not be the case had Gelhaus raised the fence line.

Finally, John Stonebraker, a county engineer and land surveyor, testified that the elevations along the fence line had not changed considerably from 1978, when the first survey was undertaken, and 1982, when a second survey was done. Stonebraker testified that the maximum difference in any of the measurements taken along the fence line was approximately five inches.

It is apparent that given the voluminous and conflicting testimony and exhibits offered into evidence at trial, a just and equitable decision in this case would weigh heavily upon the credibility of the witnesses. Our courts have repeatedly recognized that while in cases of equity the reviewing court is not bound by the fact findings of the trial court, factual disputes which depend heavily on the credibility of witnesses are best resolved by the trial court which has a better opportunity to evaluate credibility than we do. *Capitol Sav. & Loan v. First Financial Sav. & Loan,* 364 N.W.2d 267, 271 (Iowa Ct.App.1984). In the present case we therefore find there is substantial evidence to support the trial court's ruling that the Gelhauses' method of plowing against the fence through the years resulted in the raising of the fence line, causing an interruption of the natural flow of water southeast across the Gelhaus property, resulting in a loss to Maisel of approximately eight to ten acres of farmland due to flooding. While the testimony of a number of witnesses testifying on behalf of Maisel varied in the exact amount the land had been raised around the fence, all were unanimous in their opinion that Gelhaus had indeed raised the fence line. Furthermore, even if the fence line had been raised by only five inches and not at least a foot as witness Ryken testified, the greater weight of the evidence suggests that this would have a damming effect on the water flowing from the north, given the relatively flat nature of the area along the fence line.

The Gelhauses argue, however, that the man-made ditch constructed by Maisel altered the natural flow of water, directing the water directly south across the Gelhaus property, rather than a more broad flowing southeasterly direction. As a result, the Gelhauses claim that this increased water flow has exacerbated flooding on their land and that they have been damaged as a result. The Gelhauses argue that the trial court erred in dismissing their counterclaim against Maisel. In a related manner, the Gelhauses additionally contend that the trial court erred in admitting and relying upon hearsay testimony regarding the attitude of George Dannenberg toward the ditch constructed by Maisel in 1966. We disagree.

The record reveals that in approximately 1966, Maisel and George Dannenberg, now deceased and former owner of the Gelhaus property, had a discussion concerning the usability of the area of land in question. Maisel testified that the area between a ditch that then existed and the fence was not farmable and that George Dannenberg had suggested to Maisel that he straighten out the ditch so that Maisel could take care of a weed problem and give Maisel a chance to farm what had otherwise been unproductive land. Maisel testified that he then straightened up the ditch at an additional length of twenty-five feet. Maisel testified that at no time did George Dannenberg ever object in any way to Maisel's actions in the construction or maintenance of the ditch. The Gelhauses contend such testimony was hearsay. The trial court initially agreed with the Gelhauses' objection, but allowed the statements into the record.

■ The statements were offered into evidence by Maisel to prove that an easement by prescription had been created by an oral agreement between Maisel and Dannenberg. A prescriptive easement is created "by adverse possession, under claim of right or color of title, openly, notoriously, continuously, and hostilely asserted against defendant for ten years or more." *Simonsen v. Todd*, 261 Iowa 485, 489, 154 N.W.2d 730, 732–33 (1967). Iowa courts have also recognized that a prescriptive easement may be created when the original use was with the consent of the servient owner and use as of right has continued for ten years. *Simonsen*, 261 Iowa at 489, 154 N.W.2d at 732–33; *Loughman v. Couchman*, 242 Iowa 885, 889, 47 N.W.2d 152, 154 (1951). In examining a long line of cases dealing with prescriptive easements and under what circumstances this principle may be applied, the Iowa Supreme Court in *Simonsen* noted that the principles have been applied mostly to drainage cases, in which the party claiming the easement has expended considerable amounts of labor or money in reliance upon the servient owner's consent or his oral argument to the use. 261 Iowa at 489, 154 N.W.2d at 733. The *Simonsen* court further noted that almost all the cases were determined on either a theory of a valid executed oral agreement or on the principle of estoppel. *Id.*

■ Prescriptive easements in regards to drainage over farmland has long been a subject in litigation in Iowa courts. In *Vannest v. Fleming*, 79 Iowa 638, 643, 44 N.W. 906, 908 (1890), the Iowa Supreme Court, in considering a drainage question remarkably similar to the question presented in the present case, noted:

> The ditch referred to in the first count was made upon defendant's land before he owned it.... It seems that defendant's grantor, and the plaintiff or his grantor, were in accord in their views as to the ditch, and its course through the two tracts of land, and either by express agreement or by mutual and silent acquiescence ... agreed upon the construction of the ditch, and the line it should pursue. Its place of crossing the dividing line was settled. The law will not permit complaint to be now made of the location and manner of construction of the ditch, after it has been acquiesced in by the parties....

With regards to a second ditch constructed under an oral agreement, the *Vannest* court held:

> The parties have recognized the ditch, have plowed and farmed in accord with it, and have expended money and labor in the performance of the contract. It can be set aside, disregarded, and annulled by neither without the consent of the other. The assent of the defendant to the construction of the ditch on his land is in the nature of a license which, having been accepted, and the rights conferred, assumed, and exercised, cannot be set aside or disregarded.

79 Iowa at 644, 44 N.W. at 908. Numerous subsequent cases concerning drainage ditches are in substantial accord with the above-outlined principles. *See McKeon v. Brammer*, 238 Iowa 1113, 1118–19, 29 N.W.2d 518, 521 (1947); *Morse v. Rhinehart*, 195 Iowa 419, 421, 192 N.W. 142 (1923); *Pascal v. Hynes*, 170 Iowa 121, 125, 152 N.W. 26, 27 (1915); *Hatton v. Cale*, 152 Iowa 485, 498, 132 N.W. 1101, 1106 (1911); *Ruthven v. Farmers Co-operative Creamery Co.*, 140 Iowa 570, 574–75, 118 N.W. 915, 916 (1908).

We find the aforementioned principles are applicable to the present case. Maisel testified that he and George Dannenberg had orally agreed that Maisel could straighten out the ditch north of the fence line so as to reclaim unusable farmland. As a result of this agreement, Maisel spent money and labor in the construction of the ditch to avert part of the natural flow of water which had apparently previously caused considerable ponding on the Maisel property. This arrangement has been in existence for more than ten years. George Dannenberg had passed away several years prior to trial. Under the circumstances, we do not believe the trial court erred in admitting the statements concerning the oral agreement between Maisel and George Dannenberg. The Gelhauses admit

that if such an agreement had existed, Maisel would have then acquired a permanent right of drainage by way of his ditch. Moreover, James Weig testified as to such agreement without objection. We therefore hold that such statements were admissible under the circumstances and that an easement was created by agreement between Maisel and George Dannenberg.

We likewise hold that the trial court did not err in dismissing the Gelhauses' counterclaim. Having already concluded that an easement creating a permanent right of drainage onto the Gelhaus property in favor of Maisel was established, the burden is on the Gelhauses to prove that Maisel's actions substantially increased the volume of water flowing onto their land or that Maisel had substantially changed his manner or method of drainage. *Oak Leaf Country Club, Inc. v. Wilson,* 257 N.W.2d 739, 745 (Iowa 1977), *citing Rosendahl Levy v. Iowa State Highway Commission,* 171 N.W.2d 530, 536 (Iowa 1969).

The Gelhauses contend that Maisel had dikes placed alongside the county road when the county regraded it, resulting in water being forced into the ditch at a greater volume. The Gelhauses also contend that Maisel placed boulders in the ditch, thereby adding an increased flow of water onto their land. The Gelhauses additionally argue that Maisel's cleaning and deepening the ditch in 1977 over their repeated objections also resulted in the increased flow of water onto their land. The Gelhauses also contend that Maisel applied a heavier dosage of weed killer along the fence line, resulting in an increased flow of water over the fence line.

Maisel, however, testified that the dikes along the county road were placed there by the county. Maisel testified that when the county took out the driveway along the fence, the flow of water then proceeded northward. Maisel testified the water was originally intended to flow through the waterway into the ditch and that he asked the county what it intended to do about it. According to Maisel, the county then suggested they put dikes along the roadway. Maisel did admit that the effect of the dikes resulted in more water being forced into the ditch.

James Weig, a tenant farmer who farmed the land in question, testified that when plowing the farmland he occasionally overturned rocks, which he would then place in the ditch. Weig testified that some of the boulders were already there when he began this practice and testified that natural erosion uncovered most of the larger rocks which are now visible. Weig also testified that his placing of the rocks in the ditch had no effect on the natural flow of water in the ditch. Concerning the spraying of weeds, Weig testified that when he began renting from Maisel, he was told by Maisel to control the weed problem. Weig testified that he did use a different spray on the fence line as compared to area surrounding the ditch.

Regarding the cleaning and deepening of the ditch in 1977, Maisel testified that he did so after years of silting had filled in the ditch. Maisel testified that he cleaned the ditch to the original level as dug in 1966. Maisel did testify that the Gelhauses lodged complaints with him about his actions, but testified that he told the Gelhauses that had they not plowed up the fence line, the increased flow onto their property would not have occurred.

■ From these facts, we cannot conclude that Maisel so altered his drainage practices as to force an increased volume of water onto the Gelhaus land. Maisel's cleaning and deepening the ditch in 1977 did no more than to restore the ditch to the original depth as contemplated in the 1966 agreement between Maisel and Dannenberg. Furthermore, the spraying of weeds in the area of the fence line was part of the original plan for constructing the ditch in 1966. Rather, it is apparent that the raising of the fence line by the Gelhauses had channelled the flow of water from a more broad southeast direction to a more easterly direction. The record additionally reveals that despite the claims of the Gelhauses that Maisel's drainage practices have resulted in increased ponding on their land, Mr. Gelhaus testified that he has not had a water problem every year. Gelhaus

testified that in the two years preceding, in 1983 and 1984, approximately thirty acres were ponded. Gelhaus testified that in other years the ponding was not quite as severe. We therefore hold the trial court did not err in dismissing the Gelhauses' counterclaim.

The Gelhauses additionally argue that the trial court erred in awarding Maisel actual damages in the amount of $1,600.00. The Gelhauses argue that Maisel had admitted that part of the drainage problems existed long before either party owned their land and argued that Maisel admitted during his deposition that he had suffered no loss. At trial, however, Maisel alleged that in 1979 and 1980, he respectively lost the rental value of eight acres due to ponding near the end of the ditch. The trial court awarded Maisel $1,600.00, based upon the cash rental value of the land in question. The value was determined by lease agreements, which placed the value of the rented land at $100.00 per acre. Maisel contends that he had forgotten about the lease provisions at the time of his deposition, but that he promptly introduced them at trial.

■ Generally, the proper measure of damages for the loss of growing crops is their value in the field at the time of their injury or their value in a matured condition less the reasonable expense of maturing and marketing. *Eppling v. Seuntjens*, 254 Iowa 396, 402, 117 N.W.2d 820, 824 (1962); *Manning v. International Harvester Co.*, 381 N.W.2d 376, 379 (Iowa Ct.App.1985). However, the plaintiff, as lessor, did not own the crops which were lost due to flooding. Therefore, the proper damages to be awarded would be the loss of the cash rent value of the land lost due to ponding. 78 Am.Jur.2d *Waters* § 141, pp. 590–91 (1975).

■ The amount of damages awarded as judgment in a non-jury case is within the ambit of the discretionary powers of the district court and will be reversed only upon a finding that such award was clearly erroneous. *Hysell v. Iowa Public Service Co.*, 534 F.2d 775, 786 (8th Cir.1976), *appeal after remand*, 559 F.2d 468 (8th Cir. 1977). In the present case, we find substantial evidence to support the trial court's award of damages. We find the record supports the finding of the trial court that as a result of the Gelhauses raising the fence line, Maisel suffered the loss of eight acres of land due to ponding in 1979 and 1980 and that lost cash rental receipts amounted to $1,600.00.

■ The Gelhauses next argue that the trial court erred in granting permanent injunctive relief ordering them to remove the diking effect of the raised fence line and permanently enjoining them from obstructing the natural flow of surface waters across their property. Based upon our above discussion and holding that the Gelhauses had obstructed the flow of surface waters, we hold that the injunctive relief granted by the district court was correct.

The Gelhauses finally argue that the trial court erred in failing to conduct a personal on-site inspection of the Gelhaus property and erred in failing to sequester witnesses upon the Gelhauses' motion. Having examined the record and all applicable authority, we conclude that the Gelhauses have neither shown nor suffered any prejudice as a result of the actions of the trial court and therefore find these contentions without merit.

AFFIRMED.