# IN THE COURT OF APPEALS OF IOWA

No. 22-0197
Filed December 21, 2022

**BETTY J. THILL, as Trustee of the BETTY J. THILL TRUST DATED AUGUST 16, 2018 and BETTY J. THILL, Individually,**
Third-Party Plaintiffs-Appellees/Cross-Appellants,

**vs.**

**DALE MANGERS,**
Third-Party Defendant-Appellant/Cross-Appellee.
_____

Appeal from the Iowa District Court for Dubuque County, John J. Bauercamper, Judge.

Neighboring landowners appeal the dismissal of their trespass and nuisance claims in this drainage dispute. **AFFIRMED ON BOTH APPEALS.**

Darin S. Harmon and Jeremy N. Gallagher of Kintzinger, Harmon & Konrardy, P.L.C., Dubuque, for appellant/cross-appellee.

Todd J. Locher of Locher & Davis PLC, Farley, for appellees/cross-appellants.

Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

"[I]f your neighbor builds a berm, you build a higher berm." So says Betty Thill, who has been engaged in an escalating battle of berms with her neighbor, Dale Mangers, for the past fifty years, which has spilled over to their other neighbors, Edward and Susan Walz. In a lawsuit initiated by the Walzes, Thill[1] and Mangers each asserted nuisance and trespass claims against the other. The district court dismissed those claims, finding "a combination of many factors is responsible for the water drainage problems" in the neighborhood. Mangers appeals, and Thill cross-appeals, from that ruling.

I.      **Background Facts and Proceedings**

There have not been many beautiful days in this neighborhood.[2] Betty Thill, Dale Mangers, and Edward and Susan Walz own neighboring properties in a rural area near Dubuque. The Walz property is separated from the Thill and Mangers properties by a railroad that runs diagonally northwest to southeast—with the Thill property directly across the railroad tracks from the Walz property. The Walz property is northeast of the railroad, and the Thill and Mangers properties are southwest. The Thill and Mangers properties are next to each other on the other side of the railroad tracks, separated by a gravel subdivision-type road named Johnson Lane. This gravel road is not maintained by the county, but it is repaired by the neighbors who use it when flooding washes out the road. Both Thill and the Walz family use this road to access their homes.

---

[1] Thill was sued individually and as trustee of the Betty J. Thill Trust.
[2] Adapted from "It's a Beautiful Day in the Neighborhood," written by Fred Rogers—the theme song to the classic television show, Mr. Rogers' Neighborhood.

The Mangers property is at a higher elevation than the Thill property. On the west and southwest side of their properties, a county road called Massey Station Road runs roughly parallel to the railroad tracks. Behind this road, there are about twenty-five acres of woodland area, which is at a higher elevation than the Mangers property. Water naturally flows downhill from the woodland area toward the Thill and Mangers properties and Johnson Lane.



To accommodate the flow of water, in the 1950s or 60s, Dubuque County installed a forty-two-inch diameter culvert that crosses under Massey Station Road near the Mangers property. Around the same time, a previous landowner in the area raised the grade of Johnson Lane to create better sight distance along Massey Station Road and installed two corrugated metal pipe culverts under the lane. After the installation, the water would go into the Massey Station culvert,

cross the corner of the Mangers property, and proceed through the Johnson Lane culverts onto the Thill property.  When this drainage system was first set up, the Thill property was undeveloped land.

That changed in 1972 when a spec home was built on the Thill property. Mangers remembered that seventeen loads of material were trucked in to build the home up higher than the surrounding ground.  It was situated "right in the middle" of what would have historically been the natural flow of water from the Mangers property.  This resulted in splitting the path of the water, with some going between Thill's home and Massey Station Road and the rest along Johnson Lane.  Thill and her late husband bought the spec home in 1976.  Thill's husband died in 2018, but Thill still resides there.

After a year of living in her home, Thill approached Mangers and told him that "she didn't think the water should be on her side" of Johnson Lane.  Starting around 1995, Thill and her late husband began blocking the culverts under Johnson Road.  They would place items like a bucket, metal stakes, rocks, and debris in front of the culverts.  Thill's husband even put a porcelain tub in the culvert, suggesting to Mangers that they "would take half of the water if [Mangers] would take half the water."  Thill testified it was their goal to make one of the culverts non-functional and divert the water over to Mangers' side.  But Thill said that "Mangers wouldn't take the water.  He just kept shoving it all to us."

Mangers began to have problems with ponding, or "backing up," of water onto his property, which caused his ground to fill with silt and level off.  He consulted with an attorney in 1995, who took pictures of the Massey and Johnson Lane culverts as they were then.  But Mangers did not pursue legal action against

Thill because he did not have the funds to do so.  Instead, he engaged in self-help measures to restore the natural flow of water.  Sometime between 2006 and 2011, Mangers built an earthen berm and timber plank barricade along the south and east of his property.  His intent was to restore what had once been a depression or swale, before it was leveled off by silt and ponding water, and direct the water back toward the culverts and Thill's property.

Thill testified that this berm caused substantially more water to flow onto her property.  During significant rainfalls, Thill would "sometimes have as high as eight, ten inches of muck in front of [her] two garages."  In the flood of 2008, her basement flooded with six inches of water.  That same event washed out Johnson Lane enough to expose one of the culverts. The culvert had disintegrated so much over the years that there was a hole at the top of it.  Thill's husband and a neighbor filled the culvert with rock so the neighbor could cross the road to get to work.  Thill, who claims to own Johnson Lane, never replaced that culvert.  And over the next decade, she continued to place rocks and other debris in front of the remaining culvert to divert water from her property.  In doing so, the opening to the culvert eventually became buried and covered by "grass and everything growing on the downstream end of it."

In March 2020, Edward and Susan Walz brought a petition against Thill claiming her actions in "blocking the culvert substantially altered the flow of water from [her] dominant estate over and across [the Walzes'] servient estate, as well as on Johnson Lane, the only point of access to and from the [Walz] property." They sought damages and injunctive relief requiring Thill to stop blocking the culvert and return it to its original condition.

Thill answered the petition and filed a third-party petition against Dale Mangers for trespass, nuisance, and injunctive relief. Thill claimed Mangers built structures on his property that "concentrate[d] and diverte[d] water" from his property onto hers "in an unnatural way." She sought compensatory and punitive damages, along with an order requiring Mangers to "restore the Thill Property to the pre-existing condition prior to the trespass and nuisance [he] caused." In his answer to the third-party petition, Mangers asserted trespass and nuisance counterclaims against Thill, claiming she "constructed barriers on her property which both dams and diverts water from his property back on to Mangers' property, as well as down the road and washes out an access road used by many neighbors," including the Walzes.

Following a bench trial, the district court issued a concise ruling that dismissed all of the claims before it "because the evidence discloses that a combination of many factors is responsible for the water drainage problems." Mangers appeals, and Thill cross-appeals; the Walz family does not appeal. For his appeal, Mangers claims the district court "erred by not ordering Thill to repair the drainage problems she created" with her "systematic blocking of the Johnson Lane culverts," which diverted the natural flow of water and "cast it back upon" his property. On cross-appeal, Thill only challenges the court's dismissal of her nuisance claim, arguing she met her burden to prove that the berm and barricade Mangers built "redirected water to the Thill property." As she did in district court, Thill seeks injunctive relief, special and punitive damages, and attorney fees.

## II.    Standard of Review

Because this case was tried in equity, our review is de novo.  Iowa R. App.

P. 6.907; *Perkins v. Madison Cnty. Livestock & Fair Ass'n*, 613 N.W.2d 264, 267

(Iowa 2000).

## III.    Analysis

At the heart of private nuisance claims[3] like these "is the concept that

property owners must not unreasonably disturb or interfere with their neighbor's

reasonable enjoyment and use of their property."  *Sojka v. Breck*,

No. 12-1019, 2013 WL 1453241, at *3 (Iowa Ct. App. Apr. 10, 2013); *accord* Iowa

Code § 657.1(1) (2020) (defining a "nuisance" in part as "an obstruction to the free

use of property, so as essentially to interfere unreasonably with the comfortable

enjoyment of life or property").  One type of nuisance is the unlawful diversion of

water "from its natural course or state, to the injury or prejudice of others."  Iowa

Code § 657.2(4).

As the above suggests, Iowa follows the "natural flow" doctrine:

> The general rule is that the dominant owner is entitled to drain surface water in a natural watercourse from his land over the servient owner's land and if any damage results the servient owner is without remedy.  This rule, however, is subject to qualification.  We have many times held that if the volume of water is substantially increased or if the manner or method of drainage is substantially changed and actual damage results, the servient owner is entitled to relief.

---

[3] We focus our analysis on the parties' competing nuisance claims, although they both also asserted claims for trespass against the other.  We do so because (1) Thill's appeal is confined to challenging the dismissal of her nuisance claim and (2) Mangers' appeal mentions both claims but does not provide a separate analysis for either, instead relying on the nuisance drainage law we have set forth in our analysis.  *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) (confining the court's consideration to issues raised on appeal); *Richardson v. Neppl*, 182 N.W.2d 384, 390 (Iowa 1970) ("A proposition neither assigned nor argued presents no question and need not be considered by us on review.").

*O'Tool v. Hathaway*, 461 N.W.2d 161, 163 (Iowa 1990) (citation omitted). The servient landowner, however, "may not interrupt or prevent the water's natural flow to the detriment of the dominant landowner." *Sojka*, 2013 WL 1453241, at *4.

Because the Mangers property sits at a higher elevation than the Thill property, the parties agree he is the dominant estate owner. *See Maisel v. Gelhaus*, 416 N.W.2d 81, 84 (Iowa Ct. App. 1987) ("With regard to ordinary surface waters, the relative elevation of the respective tracts determines which is the dominant and which is the servient estate."). From there, they each claim the other has interfered with the natural flow of surface water across the Mangers property. So the question is, how has surface water naturally flowed in the neighborhood? *See Ditch v. Hess*, 212 N.W.2d 442, 448 (Iowa 1973) (considering historical flow of surface water in examining drainage dispute).

Turning to Thill's cross-appeal first, she argues that Mangers violated his obligations as a dominant estate owner with his berm and barricade, which she contends "concentrated the flow of the storm water that discharged from the 42 inch culvert and diverted the storm water onto the Thill property further south (uphill) on the Thill property than it flowed naturally."

In support of this argument, Thill relies on testimony from her expert witness, Dennis Waugh. He concluded the original drainage path of the water from the Massey Station culvert was over Johnson Lane to the northeast of Thill's driveway. That flow was changed, according to Waugh, when Mangers installed his berm and barricade, which "diverted the outflow from the Massey Station culvert directly to culvert pipes that had been previously placed under Johnson

Lane" and across Thill's driveway. Mangers, however, had his own expert witness—Patrick Norton—who disagreed with many of Waugh's conclusions. On our de novo review of the record, we find Norton's conclusions should be afforded more weight. *See In re Marriage of Rosenfeld*, 524 N.W.2d 212, 215 (Iowa Ct. App. 1994) (giving expert testimony "the weight we consider it deserves after considering, among other things, the expert's education, experience, familiarity with the case, reasons given for the opinion, and interest, if any, in the case"); *see also Sojka*, 2013 WL 1453241, at *5–6 (discounting expert testimony that "rested on incomplete or unreliable information").

Waugh testified that his report focused on the *current* condition of the neighborhood because he "approached this as a design project in which case nothing's ever happened, nobody's there to interview. Okay, what evidence do we have to make decisions where the water's going to go?" So in reaching his conclusions, Waugh surveyed the properties and considered elevation data from the Iowa Department of Natural Resources' website collected in 2009—after the Johnson Lane culverts were blocked and after he believed the berm had been installed. He also talked to Thill for some historical background and considered photographs she provided to him. But like the elevation data, those photographs were all taken after the culverts were blocked.

In contrast, Norton considered his task to "make an opinion as to the source of the water, where the water was going, where it always had gone, what had happened in the middle and, therefore, here today." To do that, he reviewed historical aerial photographs dating back to the 1930s, topographic maps from the 1950s showing historic drainage patterns, and photographs from Mangers taken

in 1995—before the berm was built but after the culverts were obstructed. He also conducted a site visit, reviewed Waugh's report, and talked with Mangers and another neighbor. From that historical review, Norton concluded

> that historically water flowed from the property on the opposite side of Massey Station . . . flowed through a culvert underneath Massey Station Road, crossed the corner of Mr. Mangers' property through some culverts that had been systematically blocked over the course of many years.

The photographs from 1995, which Waugh did not consider in his report, were key to Norton's conclusion. Those photographs show the outlet of the Massey Station culvert on Mangers' property with a depression area sloping toward Thill's property and the inlets to the Johnson Lane culverts, which were visible in the photographs. Norton testified the 1995 photographs prove that "the natural flow of water [went] directly from the Massey Station culvert to the Johnson Lane culverts." As Norton logically questioned at trial, "Why else would they have been blocked? Why would [someone] block a culvert . . . that doesn't have water flowing through it?" When Waugh viewed those photographs for the first time at trial, he too agreed they showed that the natural flow of water in a normal rain event would go to the Johnson Lane culverts. Yet he maintained based on his survey calculations that the culverts were installed at too high of an elevation to have ever been functional. But Waugh, according to Norton, failed to consider years of erosion that could have taken place on the uphill side, which "would lower the ground making the culvert stick up in the air," and sediment deposits on the downhill side.

In the end, Norton concluded that Thill's blocking of the Johnson Lane culverts "would have began all of the problems. . . . [O]nce the culverts were

blocked, the water that formerly flowed through those culverts was then forced to flow along Johnson Lane and until it reached a . . . point where it would flow over." *See Moody v. Van Wechel*, 402 N.W.2d 752, 757 (Iowa 1987) ("Water from a dominant estate must be allowed to flow in its natural course onto a servient estate. The flow may not be diverted by obstructions erected or caused by either estate holder."). He believed the berm and barricade Mangers built was an attempt to return to that natural flow pattern that Thill interrupted.

On our de novo review of the record, we agree with the district court that Thill did not prove that Mangers substantially changed the method or manner of the natural water flow. *See Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 90 (Iowa 2022). As a result, her nuisance claim fails, as do her requests for injunctive relief, special and punitive damages, and attorney fees.

This leaves us with Mangers' appeal, which is limited to the claim that the district court "erred by not ordering Thill to repair the drainage problems she created." Thill argues this claim was not preserved because Mangers only sought damages, not injunctive relief, for his trespass and nuisance counterclaims. We agree.

Mangers' counterclaim pled two counts against Thill—one for trespass and one for nuisance. For each, Mangers simply asked for judgment against Thill "for property damage and diverting and damming water," without a general equitable prayer for relief. *Cf. Jorge Constr. Co. v. Weigel Excavating & Grading Co.*, 343 N.W.2d 439, 441 (Iowa 1984) (noting a prayer for general equitable relief "often will justify a court in granting relief beyond what is asked in specific prayers"). But by trial, that requested relief had evolved into one for an order requiring Thill "to

restore the culverts and restore the natural flow of water as it would otherwise have been, namely, flowing across Dale Mangers' property, through the culverts under Johnson Lane and across Betty Thill's property." Mangers made this request for injunctive relief during his testimony and in a post-trial brief.

Thill did not object to Mangers' change in remedy at trial, which would normally allow us to treat his request for injunctive relief as if it had been raised in the pleadings. *See* Iowa R. Civ. P. 1.457 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *Lee v. State*, 844 N.W.2d 668, 679–80 (Iowa 2014) ("[P]arties may consent to try issues beyond the scope of the pleadings."). The problem, however, is that the district court did not rule on Mangers' request for injunctive relief. *See Est. of Cawiezell v. Coronelli*, 958 N.W.2d 842, 848 (Iowa 2021) ("In order for error to be preserved, the issue must be both raised *and decided by* the district court." (emphasis added)). Instead, its decision was limited to the counterclaims Mangers pled— trespass and nuisance—for which he only sought damages. *Cf. Lee*, 844 N.W.2d at 680 (considering plaintiff's request for reinstatement to employment she had been terminated from when the parties tried the issue by consent and the district court ordered her reinstatement). We recognize the court rejected the Walzes' request for injunctive relief against Thill, but they did not appeal that ruling. And Mangers cannot do so in their place. *See Kintzel v. Wheatland Mut. Ins. Ass'n*, 203 N.W.2d 799, 803 (Iowa 1973) (noting we cannot consider errors affecting a non-appealing party).

For these reasons, we conclude error was not preserved on Mangers' request for injunctive relief. Because Mangers' appeal was limited to that issue, we affirm the dismissal of his trespass and nuisance claims.

## IV.  Conclusion

On our de novo review of the record, we find that Thill did not prove that Mangers substantially changed the method or manner of the natural water flow. So her nuisance claim fails, as do her requests for injunctive relief, special and punitive damages, and attorney fees. As for Mangers' trespass and nuisance claims, we conclude he failed to preserve error on his request for injunctive relief—the sole issue he raises on appeal. The district court's ruling dismissing the parties' claims is accordingly affirmed.

**AFFIRMED ON BOTH APPEALS.**